IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

| | | |
|---|---|---|
| IN RE: | : | Bankruptcy No. 5:03-BK-1802 |
| | : | |
| WEIRTON STEEL CORPORATION, *et al.*, | : | Chapter 11 |
| | : | |
| Debtors. | : | L. Edward Friend, II |
| | : | United States Bankruptcy Judge |

**DISCLOSURE STATEMENT TO ACCOMPANY**
**FIRST AMENDED PLAN OF LIQUIDATION DATED JULY 9, 2004**

**McGUIREWOODS LLP**
Robert G. Sable
Mark E. Freedlander
James H. Joseph
Dominion Tower, 23rd Floor
625 Liberty Avenue
Pittsburgh, PA 15222
Telephone: 412.667.6000
Facsimile: 412.667.6050

-and-

**BAILEY, RILEY, BUCH & HARMAN, L.C.**
Arch W. Riley, Jr.
Riley Building
53 - 14th St. Ste. 900
Wheeling, WV 26003-0081
Telephone: 304.232.6675
Facsimile: 304.262.9897

Co-Counsel to Weirton Steel Corporation

## IMPORTANT NOTICE

This Disclosure Statement and its related documents are the only documents authorized by the Bankruptcy Court to be used in connection with the solicitation of votes to accept the Plan. No representations have been authorized by the Bankruptcy Court concerning the Debtor, its business operations or the value of its assets, except as explicitly set forth in this Disclosure Statement.

Please refer to the Plan (or, where indicated, certain motions filed with the Bankruptcy Court) for definitions of the capitalized terms used in this Disclosure Statement.

The Debtor reserves the right to file an amended Plan and Disclosure Statement from time to time. The Debtor urges you to read this Disclosure Statement carefully for a discussion of voting instructions, recovery information, classification of claims, the history of the Debtor and the Chapter 11 Case and a summary and analysis of the Plan.

The Plan and this Disclosure Statement have not been required to be prepared in accordance with federal or state securities laws or other applicable nonbankruptcy law. This Disclosure Statement has been approved by the Bankruptcy Court as containing "adequate information"; however, such approval does not constitute endorsement of the Plan or Disclosure Statement by the Bankruptcy Court and none of the United States Securities and Exchange Commission, any state securities commission or similar public, governmental or regulatory authority has approved this Disclosure Statement, the Plan or the securities offered under the Plan, or has passed on the accuracy or adequacy of the statements in this Disclosure Statement. Any representation to the contrary is a criminal offense. Persons trading in or otherwise purchasing, selling or transferring securities of the Debtor should evaluate the Plan in light of the purposes for which it was prepared.

This Disclosure Statement contains only a summary of the Plan. This Disclosure Statement is not intended to replace the careful and detailed review and analysis of the Plan, only to aid and supplement such review. This Disclosure Statement is qualified in its entirety by reference to the Plan, and the exhibits attached thereto and the agreements and documents described therein. If there is a conflict between the Plan and this Disclosure Statement, the provisions of the Plan will govern. You are encouraged to review the full text of the Plan and to read carefully the entire Disclosure Statement, including all exhibits, before deciding how to vote with respect to the Plan.

Except as otherwise indicated, the statements in this Disclosure Statement are made as of June 7, 2004, and the delivery of this Disclosure Statement will not, under any circumstances, imply that the information contained in this Disclosure Statement is correct at any time after June 7, 2004. Any estimates of claims or interests in this Disclosure Statement may vary from the final amounts of claims or interests allowed by the Bankruptcy Court. In addition, the treatment of creditors under the Plan described herein is subject to change as such treatment continues to be negotiated.

You should not construe this Disclosure Statement as providing any legal, business, financial or tax advice. You should, therefore, consult with your own legal, business, financial and tax advisors as to any such matters in connection with the Plan, the solicitation of votes on the Plan and the transactions contemplated by the Plan.

As to contested matters, adversary proceedings and other actions or threatened actions, this Disclosure Statement is not, and is in no event to be construed as, an admission or stipulation as to any fact or allegation.

# TABLE OF CONTENTS

**Page**

I.      OVERVIEW OF THE DISCLOSURE STATEMENT ...................................................1

II.     SUMMARY AND OVERVIEW OF THE PLAN...................................................6

III.    GENERAL INFORMATION...................................................10

    A.      Overview of Chapter 11 ...................................................10

    B.      Description of Debtor ...................................................10

IV.     PREPETITION SECURED DEBT ...................................................12

    A.      Revolving Credit Facility ...................................................12

    B.      Notes ...................................................12

    C.      Bonds ...................................................12

    D.      MABCO Vendor Financing Program ...................................................13

V.      THE CHAPTER 11 CASE ...................................................14

    A.      Weirton's Chapter 11 Filing ...................................................14

    B.      Debtor-in-Possession Financing ...................................................14

    C.      The Official Committee of Unsecured Creditors ...................................................15

    D.      The Official Committee of Retirees ...................................................15

    E.      Compliance with Bankruptcy Code, Bankruptcy Rules, Local Court Rules and U.S. Trustee Deadlines ...................................................16

    F.      Weirton's 2003 Plan of Reorganization ...................................................16

    G.      Marketing of the Debtor's Operations ...................................................16

    H.      Auction and Sale of Substantially All of Weirton's Assets ...................................................17

    I.      Termination of Retiree Benefits...................................................21

    J.      Termination of Pension Plans ...................................................21

    K.      Termination of Collective Bargaining Agreements With the ISU and IGU ...................................................22

    L.      Extension of the Debtor's Exclusivity Periods ...................................................22

VI.     PLAN OF LIQUIDATION...................................................23

    A.      General Description of the Plan ...................................................23

    B.      Unclassified Allowed Claims and Their Treatment...................................................23

    C.      Classification and Treatment of Allowed Claims and Equity Interests ...................................................24

    D.      Claims Bar Date...................................................27

    E.      Treatment and Status of Certain Claims ...................................................27

    F.      Confirmation Hearing ...................................................32

    G.      Cancellation of Existing Securities and Agreements...................................................33

    H.      Means of Executing the Plan ...................................................33

i

**TABLE OF CONTENTS**

(continued)

I.  Treatment of Disputed, Contingent and Unliquidated Claims ........................................... 40

J.  The Creditors' Committee and the Retiree Committee ................................................... 41

K.  Vesting of Property and Discharge of Claims ............................................................... 41

L.  Exculpation .................................................................................................................... 42

M.  Executory Contracts ...................................................................................................... 42

N.  Retention of Jurisdiction of the Bankruptcy Court ....................................................... 43

O.  Conditions to Effectiveness of the Plan ........................................................................ 44

P.  Releases ......................................................................................................................... 44

Q.  Release of Other Third Parties ...................................................................................... 45

R.  Other Miscellaneous Provisions .................................................................................... 45

VII.  PROJECTED DISTRIBUTION TO CREDITORS ................................................................. 46

VIII.  UNITED STATES FEDERAL INCOME TAX CONSIDERATIONS ...................................... 46

A.  Introduction ................................................................................................................... 46

B.  Certain Material United States Federal Income Tax Consequences to the Debtors ........ 47

C.  Certain Material United States Federal Income Tax Consequences to Holders of Claims ............................................................................................................................. 47

IX.  ALTERNATIVES TO THE PLAN ........................................................................................ 49

A.  Other Plans of Reorganization ...................................................................................... 49

B.  Liquidation Under Chapter 7 of the Bankruptcy Code .................................................. 49

X.  CONFIRMATION REQUIREMENTS ................................................................................... 49

A.  The Confirmation Hearing ............................................................................................. 49

B.  Acceptances Necessary to Confirm the Plan ................................................................. 50

C.  Best Interests of Creditors ............................................................................................. 50

D.  Feasibility ...................................................................................................................... 51

E.  Confirmation of the Plan ............................................................................................... 52

XI.  CERTAIN RISK FACTORS TO BE CONSIDERED ............................................................. 52

A.  Parties-In-Interest May Object to the Debtor's Classification of Claims ....................... 52

B.  The Debtor's Ability to Consummate Is Subject to a Favorable Resolution of the Claims of the PBGC and the West Virginia Workers' Compensation Commission ........ 52

C.  The Debtor May Not Be Able to Secure Confirmation of the Plan ................................ 52

D.  The Debtor May Object to the Amount or Classification of Your Claim ........................ 53

E.  Insurance Claims ........................................................................................................... 53

ii

**TABLE OF CONTENTS**

(continued)

                                                                                                            **Page**

XII.    WHERE YOU CAN OBTAIN MORE INFORMATION ............................................................53

XIII.   CONCLUSION AND RECOMMENDATION .........................................................................55

\\\\Case.5\03-bk-01802    Doc 2594    Filed 07/09/04    Entered 07/09/04 17:27:15    Desc
Main Document       Page 5 of 61

=

**EXHIBITS**

Exhibit A –Plan of Liquidation

Case 5:03-bk-01802   Doc 2594   Filed 07/09/04   Entered 07/09/04 17:27:15   Desc
Main Document   Page 6 of 61

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

| | | |
|---|---|---|
| IN RE: | : | Bankruptcy No. 5:03-BK-1802 |
| | : | |
| WEIRTON STEEL CORPORATION, *et al.*, | : | Chapter 11 |
| | : | |
| Debtors. | : | L. Edward Friend, II |
| | : | United States Bankruptcy Judge |

## I.    OVERVIEW OF THE DISCLOSURE STATEMENT[1]

### PURPOSE OF DISCLOSURE STATEMENT

Weirton Steel Corporation ("Weirton" or the "Debtor") prepared this Disclosure Statement ("Disclosure Statement") to accompany and in connection with its solicitation of acceptances of the Debtor's First Amended Plan of Liquidation dated July 9, 2004 ("Plan"), filed in the Debtor's reorganization proceedings ("Chapter 11 Case") under chapter 11 of title 11, United States Code (the "Bankruptcy Code"), pending in the United States Bankruptcy Court for the Northern District of West Virginia (the "Bankruptcy Court").[2]  After notice and hearing, and upon order of the Bankruptcy Court entered [_____], 2004, the Bankruptcy Court approved this Disclosure Statement as containing information of a kind and in sufficient detail that would enable a hypothetical reasonable investor, typical of holders of claims and interests of the classes being solicited, to make an informed judgment whether to vote to accept or reject the Plan.

A copy of the Plan is attached to this Disclosure Statement and incorporated into this Disclosure Statement by reference as Exhibit A.  A copy of the order of the Bankruptcy Court approving this Disclosure Statement accompanies this Disclosure Statement.

You should read this Disclosure Statement and the Plan in their entirety before voting on the Plan.  No statements or information concerning the Debtor, its subsidiaries or affiliates or any other entity described in this Disclosure Statement or the Plan, particularly, but not limited to, the Debtor's future business operations, profits, financial condition, assets or liabilities are authorized by the Debtor other than as set forth in this Disclosure Statement or Exhibit hereto.

The financial information set forth in this Disclosure Statement has not been audited by independent certified public accountants except as specifically set forth herein.  For that reason, and as a result of the complexity of the financial affairs of the Debtor (and its subsidiaries and/or affiliates, to the extent applicable), the Debtor is not able to represent and warrant that the information set forth in this Disclosure Statement is without any inaccuracy.  To the extent possible, however, the information has been prepared from the Debtor's financial books and records, and every effort has been made to ensure that all information in this Disclosure Statement has been fairly presented.

---

[1] Capitalized terms used and not defined in this Disclosure Statement shall have the meaning ascribed to such terms in the Plan.

[2] The Chapter 11 Case is being jointly administered with the cases of Weirton Venture Holdings Corporation and FW Holdings, Inc., subsidiaries of Weirton, both of which filed Notices of Conversion to Chapter 7 on June 9, 2004.

1

## PROCEDURAL INFORMATION

**Voting**

      Each holder of a Claim or Equity Interest of a Class that is "Impaired" under the Plan, but is not deemed to have rejected the Plan, will receive this Disclosure Statement, the Plan, the Voting Procedures Order, notice of the Confirmation Hearing and a ballot for accepting or rejecting the Plan. Any holder of a Claim or Equity Interest whose legal, contractual or equitable rights are altered, modified or changed by the proposed treatment under the Plan, or whose treatment under the Plan is not provided for in section 1124 of the Bankruptcy Code, is considered "Impaired." Each holder of a Claim or Equity Interest of a Class that is deemed to accept or reject the Plan will receive the Voting Procedures Order, notice of the Confirmation Hearing and a notice of non-voting status in the form approved by the Bankruptcy Court, but will not receive a ballot and will not be eligible to vote on the Plan. Holders of Claims or Equity Interests of a Class deemed to accept or reject the Plan will not receive copies of the Plan or the Disclosure Statement, but may obtain copies of these documents by mailing a written request for such materials to the Balloting Agent identified below.

<table>
<tr><td>

**Which Classes of Claims are Entitled to Vote on the Plan?**

Classes of Claims are entitled to vote on the Plan as follows:

- Claims in Classes 2, 3 and 4 are Impaired and entitled to vote on the Plan (each a "Voting Class" and together the "Voting Classes").

- Claims in Class 1 are unimpaired under the Plan, are deemed to have accepted the Plan and will not be entitled to vote on the Plan.

- Equity Interests in Class 5 will receive no distribution under the Plan, are deemed to have rejected the Plan and will not be entitled to vote on the Plan.

</td></tr>
</table>

      For a description of the Classes of Claims and Equity Interests and their respective treatment under the Plan, see Subsections (A), (B) and (C) of Section VI below.

      You may only vote on the Plan with respect to a Claim or Equity Interest if that Claim belongs to a Voting Class under the Plan. All holders of Equity Interests are deemed to have rejected the Plan and will not be entitled to vote. The Bankruptcy Court has fixed [_____], 2004, as the voting record date. To be eligible to vote on the Plan, persons with Claims that belong to the Voting Classes must have held them on the voting record date.

      Under the Bankruptcy Code, the Plan will be deemed accepted by an Impaired Class of Claims if the Balloting Agent receives votes accepting the Plan representing at least:

        • two-thirds of the total dollar amount of the allowed Claims in the Class that cast a vote; and

        • more than one-half of the total number of allowed Claims in the Class that cast a vote.

      The Voting Procedures Order will set forth which Claims are "allowed" for purposes of voting and designate the form of ballot to be used by each Voting Class. For more information on voting

\\Case 5:03-bk-01802   Doc 2594   Filed 07/09/04   Entered 07/09/04 17:27:15   Desc
Main Document   Page 8 of 61

procedures, please consult the Voting Procedures Order.

All properly completed ballots received by the Balloting Agent before 5:00 p.m. (Eastern Time) on [_____, 2004] (the "Voting Deadline"), will be counted in determining whether each Impaired Class entitled to vote on the Plan has accepted the Plan. Any ballots received after the Voting Deadline will not be counted. All ballots must contain an original signature to be counted. No ballots received by facsimile will be accepted.

---

**Voting on the Plan**

***When does the vote need to be received?*** The deadline for the receipt by the Balloting Agent of properly completed ballots is 5:00 p.m. (Eastern Time), [_____], 2004.

***Which Classes may vote?*** Persons may vote to accept or reject the Plan only with respect to Allowed Claims that belong to a Class that is Impaired under the Plan and is not deemed to have rejected the Plan. These are Classes 2, 3 and 4.

***Which members of the Impaired Classes may vote?*** The *voting record* date for determining which members of Impaired Classes may vote on the Plan is [_____], 2004. Persons may vote on the Plan only with respect to Claims that were held on the voting record date.

***How do I vote on the Plan?*** For a vote to be counted, the Balloting Agent must receive an original signed copy of the ballot form approved by the Bankruptcy Court. Faxed copies and votes sent on other forms will not be accepted.

***Who should I contact if I have questions or need a ballot?*** You may contact the Balloting Agent at the address or phone number listed below.

---

This Disclosure Statement and the Plan are the only materials that you should use in determining how to vote on the Plan. The Debtor believes that approval of the Plan provides the greatest return to holders of Claims in the Voting Classes.

---

**Voting Recommendations**

The Debtor believes that the Plan presents the best opportunity for holders of Claims to maximize their respective recoveries. **The Debtor encourages holders of Impaired Claims to vote to *accept* the Plan.**

---

The ballots have been specifically designed for the purpose of soliciting votes on the Plan from each Class entitled to vote. For this reason, in voting on the Plan, please use only the ballot sent to you with this Disclosure Statement. If you hold Claims in more than one Class, you must use a separate ballot for voting with respect to each Class of Claims that you hold. If you believe you have received the incorrect form of ballot, you need another ballot or you have any questions concerning the form of ballot, please contact the Balloting Agent.

Please complete and sign your ballot and return it in the enclosed pre-addressed envelope to the Balloting Agent. All correspondence in connection with voting on the Plan should be directed to the

3

Balloting Agent at the following address:

<div style="border:1px solid black; padding:10px; text-align:center;">

**Balloting Agent**

**By mail:**

Weirton Steel Corporation Ballot Process Center
c/o Donlin, Recano & Company, Inc.
P. O. Box [2034]
Murray Hill Station
New York, NY 10156-0701
Phone: 212.481.1411

**By overnight delivery:**

Weirton Steel Corporation Ballot Process Center
c/o Donlin, Recano & Company, Inc.
419 Park Avenue South, Suite 1206
New York, NY 10016
Phone: 212.481.1411

</div>

The Balloting Agent will prepare and file with the Bankruptcy Court a certification of the results of the voting on the Plan on a Class-by-Class basis.

Additional copies of the ballots, this Disclosure Statement and the Plan are available upon request made to the Balloting Agent. Please contact the Balloting Agent with any questions relating to voting on the Plan.

<div style="border:1px solid black; padding:10px;">

**Your Vote Is Important**

Your vote on the Plan is important because:

- Under the Bankruptcy Code, a chapter 11 plan can only be confirmed if certain majorities in dollar amount and number of claims (as described above) of each Voting Class under the plan vote to accept the plan, unless the "cram down" provisions of the Bankruptcy Code are used.

- Under the Bankruptcy Code, only the votes of those holders of claims or interests who actually submit votes on a plan are counted in determining whether the specified majorities of votes in favor of the plan have been received.

- If you are eligible to vote with respect to a Claim and do not deliver a properly completed ballot relating to that Claim by the Voting Deadline, you will be deemed to have abstained from voting with respect to that Claim and your eligibility to vote with respect to that Claim will *not* be considered in determining the number and dollar amount of ballots needed to make up the specified majority of that Claim's Class for the purpose of approving the Plan.

</div>

All pleadings and other documents referred to in this Disclosure Statement as being on file with

4

the Bankruptcy Court are available for inspection and review during normal business hours at the Office of the Clerk of the United States Bankruptcy Court for the Northern District of West Virginia, United States Federal Building & Courthouse, 12th and Chapline Streets, Wheeling, West Virginia, 26003; telephone 304.233.1655, or on-line at the Bankruptcy Court's website: http://www.wvnb.uscourts.gov.

THIS DISCLOSURE STATEMENT CONTAINS SUMMARIES OF CERTAIN PROVISIONS OF THE DEBTOR'S PLAN AND OTHER DOCUMENTS RELATING TO THE PLAN. WHILE THE DEBTOR SUBMITS THAT THOSE SUMMARIES PROVIDE ADEQUATE INFORMATION WITH RESPECT TO THE DOCUMENTS SUMMARIZED, THESE SUMMARIES ARE QUALIFIED BY THE COMPLETE TEXT OF SUCH DOCUMENTS. IF ANY INCONSISTENCIES EXIST BETWEEN THE TERMS AND PROVISIONS OF THIS DISCLOSURE STATEMENT AND THE TERMS AND PROVISIONS OF THE PLAN OR OTHER DOCUMENTS DESCRIBED HEREIN, THE TERMS AND PROVISIONS OF THE PLAN AND OTHER DOCUMENTS ARE CONTROLLING. EACH HOLDER OF AN IMPAIRED CLAIM OR EQUITY INTEREST SHOULD REVIEW THE ENTIRE PLAN AND ALL RELATED DOCUMENTS AND SEEK THE ADVICE OF ITS OWN COUNSEL AND FINANCIAL CONSULTANT BEFORE VOTING TO ACCEPT OR REJECT THE PLAN. ANY CHANGES TO THESE DOCUMENTS WILL BE DESCRIBED AT THE HEARING ON THE CONFIRMATION OF THE PLAN.

THIS DISCLOSURE STATEMENT MAY NOT BE RELIED UPON BY ANY PERSON OR ENTITY FOR ANY PURPOSE OTHER THAN BY HOLDERS OF IMPAIRED CLAIMS OR INTERESTS ENTITLED TO VOTE ON THE PLAN IN DETERMINING WHETHER TO VOTE TO ACCEPT OR REJECT PLAN. NOTHING CONTAINED IN THIS DISCLOSURE STATEMENT WILL CONSTITUTE AN ADMISSION OF ANY FACT OR LIABILITY BY ANY PARTY, OR BE ADMISSIBLE IN ANY PROCEEDING INVOLVING THE DEBTOR OR ANY OTHER PARTY, OR BE DEEMED CONCLUSIVE EVIDENCE OF THE TAX OR OTHER LEGAL EFFECTS OF THE PLAN ON HOLDERS OF CLAIMS OR EQUITY INTERESTS.

EXCEPT TO THE EXTENT OTHERWISE SPECIFICALLY NOTED HEREIN, THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS GENERALLY INTENDED TO DESCRIBE FACTS AND CIRCUMSTANCES ONLY AS OF JUNE 7, 2004, AND NEITHER THE DELIVERY OF THIS DISCLOSURE STATEMENT NOR THE CONFIRMATION OF THE PLAN WILL CREATE ANY IMPLICATION, UNDER ANY CIRCUMSTANCES, THAT THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS CORRECT AT ANY TIME AFTER JUNE 7, 2004, OR THAT THE DEBTOR WILL BE UNDER ANY OBLIGATION TO UPDATE SUCH INFORMATION IN THE FUTURE.

THE DEBTOR BELIEVES THAT ACCEPTANCE OF THE PLAN IS IN THE BEST INTEREST OF EVERY CREDITOR AND RECOMMENDS THAT YOU VOTE TO ACCEPT THE PLAN.

## II.     SUMMARY AND OVERVIEW OF THE PLAN

The following table briefly summarizes the classifications and treatment of Claims and Equity Interests under the Plan.

| Class | Type of Claim or Equity Interest | Treatment | Estimated Recovery | Impairment | Voting |
|---|---|---|---|---|---|
| N/A | Administrative Claims (other than those set forth separately below) | Paid in full in Cash on the later of (i) the Effective Date of the Plan or (ii) the date on which such Administrative Claim is allowed. | 100% | N/A | No |
| N/A | Professional Fee Claims | Paid in full in such amounts as are allowed by the Bankruptcy Court (A) upon the date upon which the order relating to any such Administrative Expense Claim is entered, or (B) upon such other terms as may be mutually agreed upon between the holder of such an Administrative Expense Claim and the Debtor. | 100% | N/A | No |
| N/A | U.S. Trustee Fees | Paid on a quarterly basis as required by statute until the Chapter 11 Case is closed. | 100% | N/A | No |
| N/A | Priority Tax Claims | Except to the extent that the holder of a Priority Tax Claim agrees to a different treatment, each holder of an Allowed Priority Tax Claim shall receive on the Effective Date, or as soon thereafter as is reasonably practicable, after payment of up to $6 million to holders of Class 2 Claims (including the Bonus Pool), the lesser of a Pro Rata Share of all available Cash or an amount in Cash equal to the Allowed Amount of such Claim. | 100% | N/A | No |
| Class 1 | Other Secured Claims | On or as soon as reasonably practicable after the Effective Date, each holder of an Allowed Other Secured Claim shall receive, at the option of the Debtor, and in full satisfaction of such Claim, either (i) Cash in an | 100% | Unimpaired | No |

6

| Class | Type of Claim or Equity Interest | Treatment | Estimated Recovery | Impairment | Voting |
|-------|----------------------------------|-----------|--------------------|------------|--------|
| | | amount equal to one hundred percent (100%) of the unpaid amount of such Allowed Other Secured Claim, (ii) the proceeds of the sale or disposition of the Collateral securing such Allowed Other Secured Claim to the extent of the value of the holder's secured interest in the Allowed Other Secured Claim, net of the costs of disposition of such Collateral, or (iii) such other distribution as necessary to satisfy the requirements of the Bankruptcy Code. In the event the Debtor treats a Claim under clause (i) or (ii) of Section 4.1 of the Plan, the liens securing such Other Secured Claim shall be deemed released. | | | |
| Class 2 | Note and Bond Claims | In addition to the $30.0 million paid by the Debtor with respect to Allowed Class 2 Claims on the Closing Date, in accordance with the Settlement and Lockup Agreement, after payment by the Debtor of all Allowed Administrative Expense Claims under Section 2.1, including compensation and reimbursement claims under Section 2.2, and after the Debtor has liquidated all of its remaining assets that are reasonably able to be liquidated, the Debtor shall pay the lesser of Six Million ($6,000,000) Dollars, less 10% of the recovery by Class 2 claimants between $32 million and $36 million (the "Bonus Pool"), or all remaining assets in the Debtor's Estate, less the Bonus Pool, to the order of J.P. Morgan for the benefit of Class 2 claims. To the extent practical, the Debtor may make earlier distributions consistent with the needs of the Debtor's Estate. | 100% of allowed secured claim pursuant to Settlement and Lockup Agreement | Impaired | Yes |

7

| Class | Type of Claim or Equity Interest | Treatment | Estimated Recovery | Impairment | Voting |
|---|---|---|---|---|---|
| **Class 3** | Priority Non-Tax Claims | Except to the extent that a holder of an Allowed Priority Non-Tax Claim against the Debtor agrees to a different treatment of such Claim, on the Effective Date, or as soon thereafter as is reasonably practicable, each such holder shall receive a Pro Rata Share of all remaining Cash after payment of all Allowed Claims in Sections 2.1, 2.2, 2.3, 4.1 and 4.2 of the Plan, on the Effective Date or as soon thereafter as is practicable. | 100% | Impaired | Yes |
| **Class 4** | General Unsecured Claims | The holders of Allowed General Unsecured Claims shall receive their Pro Rata Share of all remaining Cash after payment in full of all Allowed Claims in Sections 2.1, 2.2, 2.3, 4.1, 4.2 and 4.3 of the Plan, on the Effective Date or as soon thereafter as is practicable. | 0% | Impaired | Yes |
| **Class 5** | Equity Interests | Allowed Class 5 Equity Interests will receive no distribution under the Plan, and will be cancelled on the Effective Date. | 0% | Impaired | No |

8

## Estimated Allowed Claims and Projected Distributions

| Class and Type of Claim | Estimated Allowed Amounts | Projected Distribution |
|---|:---:|:---:|
| N/A  Administrative (other than as specified below) | $18,800,000[*] | 100% |
| N/A  Professional Fees | $5,000,000[†] | 100% |
| N/A  U.S. Trustee Fees | $100,000[‡] | 100% |
| N/A  Priority Tax | $5,000,000[§] | 100% |
| Class 1 Other Secured Claims | $700,000[**] | 100% |
| Class 2 Note and Bond Claims | $6,000,000[††] | 100% |
| Class 3 Priority Non-Tax Claims | $1,000,000 | 100% |
| Class 4 General Unsecured Claims | $1,000,000,000[‡‡] | None |
| Class 5 Equity Interests | N/A | None |

---

[*] Estimates based upon internal records and assumptions.  Administrative Expense Claim bar date is July 2, 2004. This amount does not include the PBGC's asserted Administrative Expense Claim in the approximate amount of at least $82 million.

[†] Through carveout period of May 19, 2003, through May 16, 2004.

[‡] Estimated maximum.

[§] Combined, the PBGC and the Commission assert unsecured priority tax claims exceeding $935 million, however, the amount listed is Weirton's best estimate of the maximum allowed priority claim of these agencies, and the listing of this amount by Weirton shall not be deemed an admission as to the liability of Weirton or the priority of such claims, nor shall it be deemed to be a waiver of any defense to the liability or priority of such claims.

[**] Estimated maximum amount of all mechanics' lien claims that could be allowed.  This estimate does not include the asserted mechanic's lien claim fo Minteq International, Inc. ("Minteq"), which claim was assumed by the Buyer under the ISG Agreement, subject to the Debtor's defenses against Minteq.  Accordingly, Buyer will substitute for the Debtor as plaintiff in the adversary proceeding that is pending against Minteq with respect to such claim.

[††] Pursuant to the Sale Order, the Collateral securing the Notes and Bonds (which had an aggregate original principal amount of approximately $145 million) was determined to be $20.4 million, which was required to be paid to the holders of the Note and Bonds from the proceeds of the Sale Transaction.  Pursuant to the Settlement and Lockup Agreement, such holders received an additional $9.6 million on the Closing Date on account of their asserted claim for the postpetition diminution in the value of their Collateral.  Weirton has agreed to pay up to an additional $6 million in accordance with the provisions of Class 2 in satisfaction of the Collateral value diminution claim of the holders of the Notes and Bonds.  Accordingly, the Claims of holders of the Notes and Bonds are allowed at an aggregate amount of $36 million in Class 2, of which $30 million has already been paid, and such Claims will be allowed in the aggregate amount of $109.5 million in Class 4.

[‡‡] Weirton does not anticipate that funds will be available for distribution to holders of General Unsecured Claims, and accordingly, Weirton has not reconciled claims filed as against claims reflected in Weirton's books and records.

## III.    GENERAL INFORMATION

### A.    Overview of Chapter 11

Chapter 11 is the primary business reorganization chapter of the Bankruptcy Code. Under chapter 11 of the Bankruptcy Code, a debtor is authorized to reorganize its business and affairs for itself, its creditors and its equity interest holders. In addition to permitting the rehabilitation of a debtor, another goal of chapter 11 is to promote equality of treatment for similarly situated creditors and similarly situated equity interest holders with respect to distributions of the value of a debtor's assets.

The commencement of a chapter 11 case creates a bankruptcy estate that is comprised of all of the legal and equitable interests of a debtor as of the commencement date of the chapter 11 case. The Bankruptcy Code provides that a debtor may continue to operate its business and affairs and remain in possession of its property as a "debtor-in-possession".

The consummation of a plan of reorganization is the fundamental objective of a chapter 11 reorganization case. A plan of reorganization sets forth the means for restructuring a debtor's business and satisfying claims against and interests in a debtor. Confirmation of a plan of reorganization by a bankruptcy court binds the debtor, any issuer of securities under the plan, any person acquiring property under the plan, and any creditor or equity interest holder of a debtor. Pursuant to section 1123(a)(5), a debtor is permitted to distribute its property to those Persons with an interest in such property. Also, pursuant to section 1129(a)(11) of the Bankruptcy Code, a plan may provide for the liquidation of the debtor.

Certain holders of claims against and interests in a debtor are permitted to vote to accept or reject the plan. Prior to soliciting acceptances of the proposed plan, however, section 1125 of the Bankruptcy Code requires a debtor to prepare a disclosure statement containing adequate information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment regarding the plan. The Debtor is submitting this Disclosure Statement to holders of claims against and equity interests in the Debtor to satisfy the requirements of section 1125 of the Bankruptcy Code.

### B.    Description of Debtor

#### 1.    The Debtor

Weirton was a major integrated producer of flat-rolled carbon steel with principal product lines consisting of tin mill products and sheet products. Weirton is a Delaware corporation formed in 1982 with administrative offices and, formerly, production facilities located in Weirton, West Virginia. Weirton and its predecessor companies were in the business of making and finishing steel products for over 90 years. From 1929 to 1984, Weirton's business was operated as the Weirton Steel Division of National Steel Corporation ("National"). Weirton acquired its principal operating assets from National in January 1984, as the largest ESOP at the time, and became a publicly traded company in June 1989. As more fully described in Subsection G of Section V below, effective as of May 17, 2004, Weirton and two of its debtor affiliates sold substantially all of their assets to ISG Weirton Inc., a wholly owned subsidiary of International Steel Group Inc. As of the Closing Date, Weirton no longer engaged in any business operations including the business of producing and selling steel or tin.

#### 2.    Employees

Immediately prior to the Closing Date, Weirton had approximately 2,374 active employees, all of whom were terminated effective upon the closing of the Sale Transaction. The Independent Steelworkers

10

Union ("ISU") represented Weirton's production and maintenance workers, clerical workers and nurses. In addition, the Independent Guard Union ("IGU") represented Weirton's security personnel.

3.    Retention of Authorized Agent and Consultants During Winddown Period

Effective contemporaneously with the closing of the Sale Transaction, all of Weirton's officers resigned or were terminated from employment with Weirton. By Order of the Bankruptcy Court dated May 18, 2004, the Bankruptcy Court approved Weirton's engagement of several former employees as consultants (the "Consultants") for the purpose of winding down Weirton's affairs and overseeing the filing and confirmation of the Plan. The Consultants are compensated on daily or hourly basis according to a form of Consulting Services Agreement that was approved by the Bankruptcy Court. In addition to the applicable daily or hourly compensation rates, each Consultant (other than Mark Kaplan, who will receive no bonus) will be entitled to receive a portion of the $400,000 Bonus Pool created pursuant to the terms of the Settlement and Lockup Agreement with J.P. Morgan and the holders of the Notes and Bonds. Other than Robert Fletcher, Howard Snyder and Peter Rich, each Consultant will receive from the Bonus Pool an amount equal to 10% of the compensation that such Consultant was paid during the course of his or her engagement. Each of Peter Rich and Howard Snyder will receive 25% of the balance of the Bonus Pool after payment of the 10% bonuses. Robert Fletcher will receive a bonus in an amount equal to the greater of $100,000 or 50% of the balance in the Bonus Pool after payment of the 10% Bonuses, to be paid first from the balance of the Bonus Pool.

4.    Properties

After the Closing of the Sale Transaction, Weirton did not own any real property that was not already subject to an agreement of sale with a third party. Weirton anticipated that the real property that was excluded from the Sale Transaction will generate $3,835,000 in gross proceeds. In addition, certain personal property was excluded from the Sale Transaction, all of which are subject to agreements of sale with various third parties and will result in $563,050 in gross proceeds. Weirton has no material leases due to (i) the Sale Transaction, and (ii) the Contract Rejection Order (as defined below).

5.    Common Equity and Related Stockholder Matters

As of April 14, 2004, there were 42,297,313 shares of common stock, $.01 par value ("Common Stock"), outstanding held by approximately 3,900 stockholders.

Prior to 1989, Weirton was owned entirely by its employees through an employee stock ownership plan, or the 1984 ESOP. In June 1989, Weirton commenced trading of its common stock on the New York Stock Exchange following an underwritten public offering by the 1984 ESOP. In September 2001, Weirton's common stock was delisted and currently trades over-the-counter.

In connection with Weirton's 1989 public offering, Weirton established a second employee stock ownership plan, or the 1989 ESOP, and funded it with the Series A Convertible Voting Preferred Stock ("Series A"). Substantially all of Weirton's employees participate in the 1984 ESOP and the 1989 ESOP, which as of December 31, 2002, owned approximately 17% of the issued and outstanding shares of Weirton's common stock and substantially all of the issued and outstanding shares of Series A, collectively representing approximately 36% of the voting power of Weirton's voting capital stock. In 1991 Weirton issued 500,000 shares of Series B Preferred Stock, all of which were redeemed in 1994. In 2002, Weirton issued 1,934,874 shares of Series C Convertible Redeemable Preferred Stock ("Series C") with a mandatory redemption in 2014 of $48.4 million. In May 2003, Weirton issued 380,000 shares of

11

Series D Preferred Stock to employees in consideration of wage concessions provided to Weirton.

Pursuant to the Plan, all Equity Interests in the Debtor will be cancelled as of the Effective Date of the Plan.

## IV.   PREPETITION SECURED DEBT

### A.   Revolving Credit Facility

As of the Commencement Date, Weirton was the borrower under that certain Amended and Restated Loan and Security Agreement dated as of May 3, 2002 and further amended and restated on June 18, 2002 (collectively, the "Prepetition Credit Facility") with Fleet Capital Corporation, individually and as agent, Foothill Capital Corporation, individually and as syndication agent, The CIT Group/Business Credit, Inc., individually and as co-documentation agent, GMAC Business Credit, LLC, individually and as co-documentation agent, and Transamerica Business Capital Corporation, individually (collectively, the "Prepetition Lenders").  The Prepetition Credit Facility was a revolving credit facility secured by a first priority lien and security interest in, *inter alia*, accounts receivable and inventory of Weirton, the #9 Tandem Mill, Hot Strip Mill and Tin Assets (all as defined in the Prepetition Credit Facility).  The Prepetition Credit Facility had a maximum availability of $200 million, subject to defined borrowing base restrictions, and up to a $25 million letter of credit subfacility.  On the Commencement Date, the principal amount due under the Prepetition Credit Facility was approximately $160,551,115.93 million, including contingent liabilities under outstanding letters of credit, plus accruing interest, fees, costs and other expenses.

### B.   Notes

Weirton is the issuer of $118,242,300 in 10% senior secured notes due in 2008 (the "Notes") pursuant to that certain indenture between Weirton and J.P. Morgan Trust Company, National Association as indenture trustee, dated as of June 18, 2002.  The Notes and 1.9 million shares of Series C Convertible Redeemable Preferred Stock (with mandatory redemption in 2013 of $48.4 million) were issued in exchange for $110,066,000 of Weirton's 11⅜% senior notes due 2004 (with an outstanding balance of approximately $122,724,000), and $104,920,000 of Weirton's 10¾% senior notes due 2005 (with an outstanding balance of approximately $121,256,000) which were tendered.

The Notes were secured by junior liens, security interests and deeds of trust in and against Weirton's #9 Tandem Mill, Hot Strip Mill and Tin Assets.  J.P. Morgan, on behalf of the holders of the Notes, agreed to subordinate all liens, claims, encumbrances and rights of payment to the lenders under the Prepetition Credit Facility pursuant to that certain Intercreditor Agreement dated as of June 18, 2002.

Notwithstanding the tender of a substantial portion of Weirton's 11⅜% 2004 Senior Notes due 2004, and 10¾% 2005 Senior Notes, approximately $12,658,000 of the 11⅜% 2004 Senior Notes due 2004, remain outstanding and approximately $16,336,000 of the 10¾% 2005 Senior Notes, remain outstanding, and each of which is administered by Deutsche Bank Trust Company Americas ("Deutsche Bank"), as indenture trustee.

### C.   Bonds

The City of Weirton issued $27.3 million in principal amount of Series 2002 Secured Pollution Control Revenue Refunding Bonds ("Bonds") in exchange for $45,530.00 of tendered 8⅝% Pollution Control Bonds ("1989 Pollution Control Bonds") pursuant to that certain trust indenture dated as of June

18, 2002 between the City of Weirton, as issuer, and J.P. Morgan Trust Company, National Association, as indenture trustee. In consideration of the City of Weirton issuing the 1989 Pollution Control Bonds, Weirton executed a Loan Agreement dated as of November 1, 1989, with the City of Weirton pursuant to which Weirton was obligated to, *inter alia*, service and pay all obligations under the 1989 Pollution Control Bonds. As a result of the issuance of the Bonds by the City of Weirton, an Amended Loan Agreement dated June 18, 2002 was executed by Weirton and the City of Weirton.

The Bonds are secured by junior liens, security interests and deeds of trust in and against Weirton's #9 Tandem Mill, Hot Strip Mill and Tin Assets. J.P. Morgan, on behalf of the holders of Bonds, agreed to subordinate all liens, claims, encumbrances and rights of payment to the lenders under the Prepetition Credit Facility pursuant to that certain Intercreditor Agreement dated as of June 18, 2002. In accordance with that certain Collateral Agency and Second Lien Intercreditor Agreement dated as of June 18, 2002, J.P. Morgan Trust Company, N.A. was appointed as collateral agent and the liens and claims securing the Notes and Bonds were agreed to be *pari passu* in priority.

Notwithstanding the tender of a substantial portion of the 8⅝% 1989 Pollution Control Bonds due 2014, approximately $10,700,000 remains outstanding, which is administered by HSBC Bank USA ("HSBC"), as indenture trustee.

### D.    MABCO Vendor Financing Program

Weirton obtained assistance from key vendors and others through its vendor financing programs in 2001 and 2002. Weirton negotiated arrangements with over 60 vendors, utilities and local entities in the form of purchase credits or other concessions and improvements in terms to achieve one-time cash benefits aggregating at least $40 million. The vendor financing programs were primarily structured as a sale and leaseback of Weirton's Foster-Wheeler Steam Generating Plant (the "Steam Plant"), including the related real property and certain related energy generating equipment, direct advances or concessions by certain vendors and the transfer of a major operating lease to a public entity.

On October 26, 2001, Weirton sold the Steam Plant and its related assets to its wholly owned subsidiary, FW Holdings, Inc. ("FW Holdings"). FW Holdings then sold the Steam Plant to an entity owned by the aforementioned vendors, MABCO Steam Company, LLC ("MABCO"), which in turn leased the Steam Plant back to FW Holdings pursuant to a lease agreement ("MABCO Lease"). FW Holdings, commencing in the first quarter of 2003, was obligated to pay quarterly rent to MABCO in the amount of $1,242,000 (net of certain offsets taken by MABCO). FW Holdings or its designee was required to repurchase the Steam Plant for $10.00 at the end of the lease term on December 31, 2012, and likewise, had the right to purchase the Steam Plant in 2007 for the present value of outstanding rent due for the remainder of the lease term, subject to certain adjustments. Weirton purchased high and low pressure steam and electricity generated at the Steam Plant from FW Holdings in consideration of Weirton paying to FW Holdings the amounts due from FW Holdings to MABCO under the lease for the Steam Plant.

As part of the Sale Transaction, FW Holdings assumed and assigned the MABCO Lease, as modified by agreement between MABCO and the Buyer, and various ancillary agreements to the Buyer subject to the terms and conditions of an Assignment Agreement dated as of April 22, 2004, by and between Weirton, FW Holdings, MABCO, Buyer and ISG. The Assignment Agreement provided, *inter alia*, for the complete mutual release of all obligations of Weirton, FW and MABCO related to the MABCO Lease and the Steam Plant sale and leaseback transaction.

13

## V.  THE CHAPTER 11 CASE

### A.  Weirton's Chapter 11 Filing

On May 19, 2003, Weirton filed its voluntary petition for relief under chapter 11 of the Bankruptcy Code.  The underlying causes leading to the bankruptcy filing stemmed from circumstances faced by numerous other integrated steel producers that also filed for bankruptcy protection over the course of the past three years.  Notwithstanding Weirton having achieved: (a) nearly $115 million in net cost reductions from labor and employment concessions; (b) debt restructuring of approximately $250 million of note obligations; and (c) vendor financing programs, all since the beginning of 2001, Weirton was unable to overcome losses incurred by sustained levels of unfairly traded steel imports and a slowing world economy that, together, severely reduced prices, shipments and production.  Weirton also faced the statutory obligation to make pension contributions of approximately $70 million per year for approximately 5 years in order to address underfunding obligations.  Moreover, as a result of the bankruptcy filings and distressed asset acquisitions involving several of Weirton's larger competitors, Weirton found itself at a significant cost disadvantage in light of reorganized and consolidated steel capacity being operated free of the substantial financial burden of legacy costs.  The environment in which Weirton was forced to operate since the beginning of 2001, deteriorated to a point where sustained operating losses and negative cash flow so heavily damaged Weirton's financial condition that bankruptcy protection became the only prudent action available to Weirton in order to preserve its value.

### B.  Debtor-in-Possession Financing[10]

By Order dated May 21, 2003, in addition to the cash collateral order entered by the Bankruptcy Court, the Bankruptcy Court authorized the Debtor to obtain interim postpetition financing on a secured, superpriority basis.  As of May 20, 2003, the Debtor, as borrower, entered into the Postpetition Credit Agreement with the Postpetition Lenders.  The Postpetition Credit Agreement provided for a term loan of $25 million ("DIP Term Loan") and revolving credit loan availability of up to $200 million ("DIP Revolver"; together the DIP Term Loan and the DIP Revolver are the "Postpetition Facility").  Additionally, on June 16, 2003, the Bankruptcy Court entered a Final Order Authorizing Debtor to: (i) Incur Postpetition Debt; and (ii) Grant Certain Liens and Provide Security, Adequate Protection, and Other Relief to Fleet Capital Corporation, as Agent, and J.P. Morgan Trust Company, National Association, as Indenture Trustee (the "Final DIP Order").

Pursuant to the Final DIP Order, the Bankruptcy Court determined that holders of the Notes and Bonds were entitled to adequate protection only to the extent of diminution in value of their collateral, as contemplated by section 361 of the Bankruptcy Code.  In that regard, the Final DIP Order granted the trustee for the holders of the Notes and Bonds, for the benefit of itself as collateral agent for the holders of the Notes and Bonds, properly perfected replacement liens in substantially all assets of the Debtor that are junior in all respects to the Postpetition Liens, the Prepetition Liens, all other claims of the Postpetition Agent, each Postpetition Lender, Prepetition Agent, and each Prepetition Lender, including, without limitation, any claims of any such party under sections 503, 507(b) and 364(c) of the Bankruptcy Code, and all other Permitted Liens.  The Final DIP Order also provided that, if an to the extent that the adequate protection granted to the holders of the Notes and Bonds pursuant to the Final DIP Order, proves insufficient, the trustee for the holders of the Notes and Bonds shall have a superpriority administrative

---

[10] Capitalized terms related to the Debtor-in-Possession financing that are not defined herein, shall have the meanings ascribed to them in the Plan or the Postpetition Credit Agreement, in that order.

\\Case 5:03-bk-01802    Doc 2594    Filed 07/09/04    Entered 07/09/04 17:27:15    Desc
Main Document      Page 20 of 61

claim in accordance with sections 503(b) and 507(b) of the Bankruptcy Code, junior to the Postpetition Liens, the Prepetition Liens, the other Permitted Liens, and all other claims of the Postpetition Agent, each Postpetition Lender, Prepetition Agent and each Prepetition Lender, including, without limitation, any claims of any such party under sections 503, 507(b) or 364 of the Bankruptcy Code. The Final DIP Order also allowed, as of the Commencement Date, (i) a claim in the amount of $118,242,300, plus accrued and unpaid prepetition interest, fees and expenses with respect to the holders of the Notes and Bonds and (ii) a claim in the amount of $27,348,000, plus accrued and unpaid interest, fees and expenses, but preserved the issue of the extent of value of the section 506(a) allowed secured claim of the holders of the Notes and Bonds.

As required by the ISG Agreement, on the Closing Date the Postpetition Lenders received an amount from the proceeds of the Sale Transaction sufficient to satisfy the DIP Obligations in full. The Postpetition Agent holds $1,000,000 as cash collateral for drafts and checks of Weirton that were outstanding as of the Closing Date, any remaining balance of which (after payment of any such outstanding drafts and checks) shall be returned to Weirton after the earlier of (i) production of evidence satisfactory to the Postpetition Agent that all drafts and checks outstanding as of the Closing Date have cleared, or (ii) 60 days after the Closing Date. The Postpetition Agent holds an additional $500,000 for accrued, accruing and unpaid fees of its counsel, the balance of which after payment of such fees shall be returned to Weirton.

### C.    The Official Committee of Unsecured Creditors

On or about May 20, 2003, the U.S. Trustee filed its Notice of Appointment of Creditors' Committee and appointed six (6) members to serve on a single Creditors' Committee and to represent the interests of all general unsecured creditors of the Debtor. The six (6) members were (i) Deutsche Bank Trust Company Americas; (ii) Henkel Corp.; (iii) International Mill Service, Inc.; (iv) Pension Benefit Guaranty Corp.; (v) Solid Waste Services, Inc. d/b/a J.P. Mascaro; and (vi) Allegheny Power. On or about May 27, 2003, the U.S. Trustee filed its First Amended Notice of Appointment of Committee of Unsecured Creditors and named Institutional Trust Services/J.P. Morgan Trust Co., N.A. as an additional member to the Creditors' Committee, thereby increasing the membership of the Creditors' Committee to seven (7).

On or about June 10, 2003, the Office of the U.S. Trustee filed its Second Amended Appointment of Committee of Unsecured Creditors and named two additional members to the Creditors' Committee, namely HSBC Bank USA and Cleveland-Cliffs, Inc. As such, the nine (9) members of the Creditors' Committee are as follows: (i) Deutsche Bank Trust Company Americas; (ii) Henkel Corp.; (iii) International Mill Service, Inc.; (iv) Pension Benefit Guaranty Corp.; (v) Institutional Trust Services/J.P. Morgan Trust Co., N.A.; (vi) Solid Waste Services, Inc. d/b/a J.P. Mascaro; (vii) Allegheny Power; (viii) HSBC Bank USA; and (ix) Cleveland-Cliffs, Inc. In addition, the Independent Steelworkers Union ("ISU") was named as an ex officio member of the Creditors' Committee. The Creditors' Committee counsel is the New York office of Blank Rome LLP, with the Pittsburgh, Pennsylvania law firm of Campbell & Levine, LLC as local co-counsel. The financial advisor to the Creditors' Committee is CIBC World Markets Corp. In November 2003, Institutional Trust Services/J.P. Morgan Trust Co., N.A. resigned from the Creditors' Committee.

### D.    The Official Committee of Retirees

As of the Commencement Date, there were approximately 10,000 retired employees and their dependents or their surviving spouses covered by the Debtor's pension and retiree benefit plans. By order dated June 2, 2003, the Bankruptcy Court approved the formation of a statutory committee of salaried

15

retired employees ("Retirees' Committee") pursuant to section 1114 of the Bankruptcy Code, to represent the interests of the Debtor's salaried retired employees. In accordance with section 1114 of the Bankruptcy Code, the ISU and the IGU elected to serve as the authorized representative of their respective retirees. On August 4, 2003, the Bankruptcy Court entered an order approving the appointment of five (5) persons to the Retirees' Committee, including John M. Hatala, Gloria R. Mongelluzzo, Stanley A. Gaston, Alan B. Gould and George Lacik. The Retirees' Committee members are representative of the Debtor's salaried retiree constituency. The Retirees' Committee retained the Pittsburgh office of Klett Rooney Lieber & Schorling, PC, as its counsel. At the time of formation of the Retirees' Committee, the Debtor committed to the Bankruptcy Court that all negotiations with the Retirees' Committee would occur in conjunction with negotiations with the ISU and the IGU on behalf of their respective retirees.

E.      **Compliance with Bankruptcy Code, Bankruptcy Rules, Local Court Rules and U.S. Trustee Deadlines**

On July 17, 2003, the Debtor filed its Statement of Financial Affairs, Schedules of Assets and Liabilities, and lists of Equity Security Holders, each as amended from time to time. On July 18, 2003, the U.S. Trustee conducted a meeting of creditors pursuant to section 341 of the Bankruptcy Code. Additionally, the Debtor has timely filed all monthly operating reports and timely paid all statutory quarterly fees as required by the Office of the U.S. Trustee. To the best of the Debtor's knowledge, information and belief, the Debtor has complied with all other applicable requirements of the Bankruptcy Code and Bankruptcy Rules, as well as local Bankruptcy Court rules and deadlines of the Office of the U.S. Trustee.

F.      **Weirton's 2003 Plan of Reorganization**

Over the course of the Chapter 11 Case, the Debtor focused on two main restructuring alternatives: (i) a stand-alone plan of reorganization with a primary goal of maintaining a two blast furnace operating configuration, and (ii) a sale of all or substantially all of its assets as a going concern. Liquidation, of course, was also a consideration, but the Debtor and other parties-in-interest did not believe the results of liquidation would be more beneficial to the bankruptcy estate and creditors than either a stand-alone operation or sale alternative.

On October 7, 2003, Weirton filed its Plan of Reorganization dated October 7, 2003, and accompanying disclosure statement premised upon a stand-alone reorganization with emergence financing, including emergence term debt financing guaranteed by the Emergency Steel Loan Guarantee Board. On November 13, 2003, Weirton filed its First Amended Plan of Reorganization ("Reorganization Plan") and a disclosure statement ("Amended Disclosure Statement") to accompany the Reorganization Plan, and on November 14, 2003, the Amended Disclosure Statement was approved by the Bankruptcy Court, with a confirmation hearing on the Reorganization Plan scheduled for December 16, 2003. Although Weirton made substantial progress in resolving numerous substantive matters with creditors relating to confirmation of the Reorganization Plan, certain major plan confirmation issues caused Weirton to request that the Court enter an order indefinitely adjourning the confirmation hearing on the Reorganization Plan. By order dated December 8, 2003, the Bankruptcy Court granted Weirton's request and indefinitely adjourned the confirmation hearing on the Reorganization Plan and all related deadlines.

G.      **Marketing of the Debtor's Operations**

Throughout the course of the Reorganization Plan confirmation process, Weirton and Houlihan Lokey Howard & Zukin Capital ("HLHZ"), Weirton's Bankruptcy Court approved investment banker, continued to pursue sale transaction alternatives, including discussions with ISG. Following the

16

December 8, 2003, adjournment of the confirmation hearing on the Reorganization Plan, HLHZ prepared an updated solicitation package and resolicited previously contacted acquisition candidates (as described below) for their interest in an acquisition transaction involving the business and assets of Weirton. As part of the December 2003 solicitation process, HLHZ also made initial contact with additional financial and strategic potential buyers suggested to HLHZ by the Informal Committee and the Creditors' Committee. In total, during December 2003 and January 2004, HLHZ contacted 33 strategic buyers and 31 financial buyers, including those whom were previously solicited by HLHZ in the mid-2003 solicitation process described below.

Since the Commencement Date, with the assistance of HLHZ, Weirton investigated potential sale transactions as a means of maximizing the value of Weirton's bankruptcy estate, and thereby potential recoveries to creditors of the bankruptcy estate. Toward that end, commencing at the time of its retention in May 2003, HLHZ conducted a marketing process that sought to stimulate the greatest level of interest of potential buyers in acquiring the business and assets of Weirton by approaching a broad universe of prospective strategic and financial acquirers with solicitation materials. Beginning in June 2003, HLHZ commenced the marketing process by contacting fifteen (15) strategic buyers that are engaged in manufacturing steel products (with the financial capability and union perspective that would theoretically permit a closing to occur), and twenty five (25) financial buyers that have either acquired, or expressed an interest in acquiring steel-related assets. A total of twenty (20) of the parties initially contacted in June 2003 executed confidentiality agreements, and in turn, received more detailed information about Weirton, its business and its assets. These parties were encouraged to submit an indication of interest in pursuing an acquisition. Parties electing to do so were afforded the opportunity to meet with Weirton's management team and to conduct more extensive due diligence of Weirton's business and assets in a due diligence room located at Weirton.

The aforementioned process resulted in six potential buyers (two financial and four strategic) meeting with Weirton's management team. Of these six parties, three conducted extensive on-site due diligence, and as of August 8, 2003, only one, ISG, submitted a preliminary non-binding indication of interest for the acquisition of substantially all of the assets and the business of Weirton. On August 8, 2003, Weirton received a written expression of interest from ISG regarding ISG's interest in acquiring Weirton's operating assets. Included with the expression of interest from ISG was a preliminary and non-binding term sheet outlining the general terms and conditions pursuant to which ISG proposed to acquire substantially all of the assets of Weirton. Weirton, in consultation with its Board of Directors and its legal and financial professionals, responded to ISG's expression of interest and preliminary term sheet by outlining for the benefit of ISG the parameters and conditions necessary for Weirton to engage in further discussions and negotiations with ISG regarding an acquisition transaction. Weirton also granted ISG permission to begin discussions and negotiations with the ISU regarding the proposed terms and conditions of a collective bargaining agreement between ISG and the ISU.

## H.    Auction and Sale of Substantially All of Weirton's Assets

On February 4, 2004, ISG submitted a comprehensive proposal to Weirton for the acquisition of the Sale Assets (as the term is defined in the ISG Agreement). As of February 4, 2004, no other party had provided Weirton with an offer or expressed substantial interest in acquiring the Sale Assets or any portion of Weirton's assets. From February 4, 2004 through February 18, 2004, Weirton, its legal and financial advisors engaged in substantive and good faith negotiations with ISG regarding the terms and conditions of an asset purchase agreement (the "Original Agreement"). Fundamental to these negotiations was an effort by Weirton to negotiate for consideration well in excess of that provided in the Original Agreement, however, these efforts proved unsuccessful.

<div align="center">17</div>

Weirton shared the Original Agreement with Fleet. As of February 18, 2004, Weirton was in default of certain covenants under the debtor-in-possession financing facility for December 2003, and had informed Fleet of anticipated covenant violations for January 2004.[11] In light of Weirton's covenant default status, Fleet issued an ultimatum to Weirton in response to the Original Agreement: either persuade ISG to guaranty full, final and indefeasible payment and satisfaction of the claim of the Postpetition Lenders irrespective of working capital adjustments under the Original Agreement, or Fleet promised to object to any procedures relating to a proposed sale and immediately commence the liquidation of Weirton. Following a series of negotiations between Weirton, ISG, and Fleet over a seven day period, a modification to the Original Agreement was agreed to by Fleet, and the ISG Agreement in its initial form was executed by Weirton and ISG on February 25, 2004.

In accordance with the ISG Agreement, on February 26, 2004, the Debtors filed the Sale Motion. A hearing to approve the bidding procedures ("Bidding Procedures") set forth in the Sale Motion was held on March 8, 2004 ("Bidding Procedures Hearing"), at which hearing the Bankruptcy Court resolved or overruled all objections of record and entered an Order of Court dated March 8, 2004 ("Bidding Procedures Order") approving the Bidding Procedures. At the Bidding Procedures Hearing, the Bankruptcy Court also (a) scheduled a hearing ("Sale Hearing") to approve the sale of the Sale Assets for April 14, 2004, and (b) approved the Notice of Auction and Sale Hearing.

Only one party other than certain members of the Informal Committee expressed any substantive interest in submitting a completing bid for the Sale Assets. Upon learning of an interest by Sun Capital Partners ("Sun") in potentially acquiring the Sale Assets, Weirton, its legal counsel and HLHZ endeavored to encourage Sun to bid. In particular, Weirton, its legal counsel and HLHZ spent numerous hours in discussions with Sun in order to permit Sun to perform comprehensive due diligence. Sun determined not to submit a competing bid.

In early March 2004, Corsair Special Situations Fund, L.P. ("Corsair"), a member of the Informal Committee, announced an intention to become "restricted" for the purpose of conducting due diligence in considering whether to submit a bid for the acquisition of the Debtors' assets. In early March 2004, Corsair executed a confidentiality agreement and thereby became "restricted". Management of Weirton devoted extensive time to meet with Corsair, its business and financial experts, proposed potential lenders and other holders of the Notes and Bonds. Senior management of Weirton provided significant financial data to Corsair and other holders of the Notes and Bonds and performed additional financial modeling, analysis and projections.

On or about March 31, 2004, senior management of Weirton, FTI and undersigned counsel attended a meeting at the request of the Informal Committee with, among others, counsel to the Informal Committee, financial advisors to the Informal Committee, and a restricted member of the Informal Committee, Ritchie Capital Management, LLC ("Ritchie"), and Ritchie's legal counsel. During this meeting, senior management of Weirton developed the following concerns: the Bondholders, despite a laudable effort, did not have a complete business plan, did not have a management team, did not have financial backing to support an acquisition transaction, and did not have a labor commitment from the ISU.

---

[11] The debtor-in-possession financing documents required Weirton to provide Fleet covenant compliance calculations on the last day of each month for the proceeding month, subject, however, to the requirement that Weirton immediately report the existence of a known future covenant violation

\\\\Case 5:03-bk-01802   Doc 2594   Filed 07/09/04   Entered 07/09/04 17:27:15   Desc
Main Document      Page 24 of 61

As the Sale Hearing approached, the Informal Committee requested that the sale process be adjourned for a brief period. The Debtors, in considering this request by the Informal Committee, took into account the following facts and circumstances:

- Fleet would not agree to an adjournment of Sale Hearing deadlines;

- Fleet would not grant Weirton a prospective waiver of cumulative covenant defaults;

- ISG would not agree to an adjournment of the Sale Hearing deadlines;

- The ISU, pursuant to an explanatory letter and numerous conversations with counsel, listed no less than ten elements that led the ISU to conclude not to support an acquisition of the Sale Assets by the holders of the Notes and Bonds.

The reality of Weirton's financial circumstances, the consideration of the factors listed above, and concerns regarding the feasibility of any purchase offer from members of the Informal Committee contributed to the business determination that an adjournment of the Sale Hearing placed Weirton's bankruptcy estate at risk. The extraordinary series of events transpiring in the approximately eleven months from the Commencement Date through March 2004, including but not limited to (a) the resignation of Weirton's Chief Executive Officer, (b) the inability to accomplish a stand alone plan, (c) the forced reconfiguration of steel production operations due to the force majeure by US Steel and (d) the struggle with single digit liquidity, such that Weirton had prepared for implementation of an orderly shutdown and liquidation process, convinced senior management of Weirton that the delay requested by the Informal Committee could not be supported by reasoned business judgment.

On the Bid Deadline, April 6, 2004, J.P. Morgan, in conjunction with a newly organized acquisition corporation ("Acquisition Corporation") formed by Ritchie and Corsair, submitted a bid, including credit bid provisions (the "Bondholders' Credit Bid") to the Debtors. The Bondholders' Credit Bid contained many of the same buyer conditions precedent as the ISG Agreement, however, the Bondholders' Credit Bid also contained provisions relating to conditions precedent that Weirton viewed as significantly more burdensome than those set forth under the ISG Agreement, including, but not limited to, the following:

- an absolute labor contingency;

- a time-constrained SEC registration statement requirement.

On the morning of April 9, 2004, Weirton issued, pursuant to the Bidding Procedures, a notice to J.P. Morgan and Acquisition Corporation identifying the Bondholders' Credit Bid as a Qualified Bid.

On April 12, 2004, Weirton conducted an Auction in accordance with the Bidding Procedures. Competitive bidding between ISG and Acquisition Corporation occurred, as did numerous meetings and negotiations in order to enhance the bids of each of ISG and Acquisition Corporation and likewise encourage settlement discussions between ISG and the holders of the Notes and Bonds. On the early evening of April 12, 2004, the Auction was adjourned until the morning of April 13, 2004, with the consent of ISG and Acquisition Corporation. At the conclusion of the bidding on April 13, 2004, the bid of ISG ("ISG Bid") and the bid of the Bondholders' Credit Bid were as follows:

\\Case 5:03-bk-01802   Doc 2594   Filed 07/09/04   Entered 07/09/04 17:27:15   Desc
Main Document      Page 25 of 61

|  | ISG Bid | Bondholders' Credit Bid |
|---|---|---|
| Net Cash Consideration | $151,299,000 | $138,875,000 |
| Assumed Working Capital Liabilities | $56,501,000 | $64,701,000 |
| Excluded Asset Value | $6,000,000 | $6,000,000 |
| Transition Services Agreement | $3,000,000 | $3,000,000 |
| D&O Insurance Coverage | $3,500,000 | $3,500,000 |
| Executory Contracts | $8,200,000 | $8,200,000 |
| Steelworker's Assumption | $3,000,000 | $3,000,000 |
| Assumed Environmental | $6,000,000 | $6,000,000 |
| Credit Bid Net of Capital Adjustment | -0- | $130,799,000 |
| Total Consideration | $237,500,000 | $364,075,000 |

All contingencies of substance contained in the ISG Agreement – workers compensation, Hart Scott Rodino approval, union ratification of a collective bargaining agreement, the treatment of MABCO, and lenders' consents were satisfied by the Sale Hearing. The Bondholders' Credit Bid contained contingencies including, among others, financing, US Steel coke agreement, ratification by the ISU of a union contract acceptable to Acquisition Corporation and SEC approval of a registration statement. The Board of Directors of Weirton Steel Corporation (the "Weirton Board") conducted a telephonic meeting for the purpose of discussing the ISG Bid and the Bondholders' Credit Bid on April 13, 2004, and conducted a meeting for the purpose of determining the highest or otherwise best offer on April 15, 2004. On April 15, 2004, following presentations by ISG and Acquisition Corporation and after due deliberation the Weirton Board determined to support the ISG Bid as highest and best.

The Bankruptcy Court conducted an evidentiary hearing (the "Sale Hearing") on April 20, 21 and 22, 2004, during which the Bankruptcy Court heard two days of testimony and considered legal arguments for and against the proposed Sale Transaction. At the conclusion of the Sale Hearing, the Bankruptcy Court overruled the objections of, among others, J.P. Morgan and the Informal Committee, and by order dated April 22, 2004 (the "Sale Order") approved the sale of the Sale Assets to the Buyer, free and clear of all Liens, claims, encumbrances and other interests, in accordance with the Sale Order.

On April 23, 2004, J.P. Morgan and the Informal Committee each respectively filed a Notice of Appeal to the Sale Order (the "Appeal"), and, on April 25, 2004, J.P. Morgan and the Informal Committee jointly filed a Motion to Stay the effect of the Sale Order, pending the Appeal, pursuant to Bankruptcy Rule 8005. After the Bankruptcy Court denied the Motion to Stay on April 26, 2004, J.P. Morgan and the Informal Committee immediately and jointly filed with the District Court for the Northern District of West Virginia a Motion to Stay the Sale Order pending the Appeal.

On April 30, 2004, Weirton and its debtor affiliates reached a settlement in principle with J.P. Morgan and the Informal Committee, including Corsair. On May 5, 2004, Weirton, J.P. Morgan and holders of more than $100 million in aggregate face value of Notes and Bonds executed the Settlement and Lockup Agreement, and Weirton filed an emergency motion with the Bankruptcy Court to approve the same. Pursuant to the Settlement and Lockup Agreement, the holders of the Notes and Bonds

received $30 million from the proceeds of the Sale Transaction on the Closing Date, and they will also receive the distributions, if any, of up to an additional $6 million in accordance with the treatment afforded to Class 2 Claims under the Plan.  In order to facilitate Weirton's performance under the Settlement and Lockup Agreement, the Buyer and ISG agreed to the continued waiver of certain closing conditions from May 4, 2004 to May 17, 2004.  In consideration for this concession regarding the Closing Date, Weirton agreed to waive and release all Avoidance Actions. On May 6, 2004, the Bankruptcy Court, after notice and a hearing, approved the terms of the settlement, expressly including the Settlement and Lockup Agreement.  As a result of the Bankruptcy Court's approval of the Settlement, the Appeal was dismissed.

## I.    Termination of Retiree Benefits

Since the formation of the Retirees' Committee, the Debtor and its professionals negotiated with the Retirees' Committee, the ISU and the IGU and their professionals regarding the modification of retiree benefits, as that term is defined in section 1114 of the Bankruptcy Code.  These negotiations resulted in Weirton filing a Motion on March 1, 2004, for Authority to Terminate Retiree Benefits. By Order ("Retiree Benefits Termination Order") dated March 15, 2004, the Bankruptcy Court (i) authorized Weirton to terminate all retiree benefits effective April 1, 2004; (ii) relieved Weirton from any responsibility to pay any claims of Retirees for medical services after April 1, 2004; (iii) relieved Weirton from any responsibility to pay any life insurance premiums on behalf of retirees after April 1, 2004; (iv) relieved Weirton from any responsibility to pay any amounts on account of insurance claims submitted to the appropriate third party administrator after May 15, 2004; and (v) relieved Weirton from any responsibility to pay any life insurance claim of a Retiree who died after April 1, 2004, or who submits a life insurance claim after May 15, 2004.  Pursuant to the Retiree Benefits Termination Order, the Debtor and the Retirees' Committee submitted a Stipulation pursuant to which the Debtor paid $1,400,000 to the Retirees' Committee on April 20, 2004, which payment was for the exclusive benefit of salaried, exempt non-union Retirees represented by the Retirees' Committee.

## J.    Termination of Pension Plans

Prior to the Commencement Date, Weirton maintained the Pension Plan, which was a noncontributory defined benefit pension plan covering substantially all employees of Weirton.  The Pension Plan provided benefits that are based generally upon years of service and compensation during a participant's final years of employment.  The assets of the Pension Plan are held in trust, with the assets invested primarily in common stock, fixed income securities and other short term investments.  Based upon actuarial assumptions, Weirton calculates that the Pension Plan as of October 31, 2003, was underfunded by as much as $450 million on a GAAP basis.  Weirton understands that the PBGC may agree with this calculation as the PBGC filed a proof of Claim in an amount exceeding $825 million.

As a result of National Steel Corporation, Weirton's former parent, filing for bankruptcy protection in March 2002, the PBGC, in December 2002, filed an action to terminate all of National's pension plans including the Weirton Retirement Program (the "056 Plan") that covers Weirton's employees.  By consent order dated April 21, 2003, National's pension plans, including the 056 Plan were terminated as of December 6, 2002, and taken over by the PBGC.

On October 21, 2003, the PBGC filed a complaint with the United States District Court for the Northern District of West Virginia (the "District Court") at Civil Action No. 5:03-CV241 seeking, *inter alia*, on order (1) appointing the PBGC as the statutory trustee of the Pension Plan, (2) terminating the Pension Plan, and (3) establishing October 21, 2003 as the termination date of the Pension Plan.  On or about November 5, 2003, the Board of Directors of Weirton voted to consent to the termination of the

21

Pension Plan effective as of October 21, 2003. Weirton and the PBGC executed a trusteeship agreement on November 12, 2003, pursuant to which Weirton consented to the PBGC becoming the trustee of the Pension Plan. On November 21, 2003, the District Court action was dismissed.

### K. Termination of Collective Bargaining Agreements With the ISU and IGU

As of the Commencement Date, the Debtor was a party to the following three collective bargaining agreements with the ISU: (i) with respect to hourly production and maintenance employees by Agreement effective October 26, 2001, as revised by Settlement Agreements dated November 13, 2002, and February 5, 2003, and a Memorandum of Understanding dated February 19, 2004; (ii) with respect to salary non-exempt employees by Agreement effective October 26, 2001, as revised by Settlement Agreements dated November 13, 2002, and February 5, 2003; and (iii) with respect to the nurse unit by Agreement effective September 26, 1996, as revised by Settlement Agreements dated May 17, 2001, September 14, 2001, November 13, 2002, and February 5, 2003. Weirton is also a party to a collective bargaining agreement with the IGU, effective September 26, 1996, as revised by Settlement Agreements dated June 12, 2001, September 26, 2001, November 13, 2002 and February 5, 2003, and Memoranda of Understanding dated February 19, 2004 and April 22, 2004.

On April 3, 2004, the ISU gave notice to Weirton of the ISU's termination of its collective bargaining agreements with Weirton effective June 3, 2004. The collective bargaining agreements between Weirton and the IGU provided for its termination not earlier than sixty (60) days after ratification of a successor agreement to the October 26, 2001, agreement covering Weirton's hourly production and maintenance employees. On May 16, 2004, the ISU and the IGU executed separate agreements ("Effects Bargaining Agreements") regarding, *inter alia*, the Sale Transaction and its effects on the members of the ISU and the IGU. Together, the Effects Bargaining Agreements provided for the termination of all collective bargaining agreements between Weirton and the ISU and IGU, and further provided that from and after the Closing Date, Weirton and its Estate would have no further liability under such collective bargaining agreements other than as expressly set forth in the Effects Bargaining Agreements. Certain provisions of the Effects Bargaining Agreements became effective upon execution, and the rest of the provisions will become effective upon approval of the Effects Bargaining Agreements by the Bankruptcy Court.

### L. Extension of the Debtor's Exclusivity Periods

Section 1121(b) of the Bankruptcy Code provides for an initial period of 120 days after the filing of a voluntary petition for relief under chapter 11 during which a debtor has the exclusive right to file a plan of reorganization in the reorganization proceeding. Section 1121(c)(3) of the Bankruptcy Code provides that if a debtor files a plan of reorganization within such 120 day period, the debtor has a period of 180 days from the filing of its voluntary petition for relief to obtain acceptances of such plan, during which time competing plans may not be filed. The Debtor's exclusive periods were set to expire on September 16, 2003, and November 15, 2003, respectively. On September 10, 2003, the Bankruptcy Court entered a "bridge" order extending the exclusive date for Weirton to file its Plan through September 23, 2003, which was the hearing date on the motion to extend exclusivity. On September 23, 2003, the Bankruptcy Court entered an order extending the period in which the Debtor had the exclusive right to file a plan or plans of reorganization until December 15, 2003, and the period to solicit acceptances of such plan to February 13, 2004. On December 10, 2003, the Bankruptcy Court entered a second "bridge" order extending the exclusive date for Weirton to file its Plan through December 31, 2003, which was the hearing date on the Debtor's second motion to extend exclusivity. On December 11, 2003, the Bankruptcy Court entered an order extending the period in which the Debtor had the exclusive right to file a plan or plans of reorganization until March 31, 2004, and the period to solicit acceptances of such

plan to May 31, 2004.  On March 30, 2004, the Bankruptcy Court entered a third "bridge" order extending the exclusive date for Weirton to file its Plan through the date on which the Bankruptcy Court entered a final order ruling on the Debtor's third request for an extension of exclusivity.  As of June 7, 2004, the Bankruptcy Court has not entered a final order on the Debtor's third request for an extension of exclusivity.

## VI.    PLAN OF LIQUIDATION

THE FOLLOWING DISCUSSION OF THE PLAN CONSTITUTES A SUMMARY ONLY AND IS QUALIFIED IN ITS ENTIRETY BY THE TERMS OF THE PLAN ITSELF.  YOU SHOULD READ THE PLAN BEFORE DECIDING WHETHER TO VOTE TO ACCEPT OR REJECT THE PLAN.  CHANGES MAY BE MADE TO THE PLAN.  ANY SUCH CHANGES MADE TO THE PLAN WILL BE DESCRIBED AT THE CONFIRMATION HEARING.  A copy of the Plan is attached as Exhibit A to this Disclosure Statement.

### A.    General Description of the Plan

This Disclosure Statement has been submitted by Weirton in order to afford Weirton the opportunity to confirm a Plan on or before September 7, 2004, that will be consummated on or before September 30, 2004.

### B.    Unclassified Allowed Claims and Their Treatment

#### 1.    Administrative Expense Claims.

Except to the extent that a holder of an Allowed Administrative Expense Claim agrees to a different treatment, on the Effective Date, or as soon thereafter as is reasonably practicable, the Debtor shall pay to each holder of an Allowed Administrative Expense Claim, in full satisfaction of such Claim, an amount in Cash equal to the Allowed amount of such Claim.

#### 2.    Bar Date For Administrative Expense Claims.

BY ORDER OF THE BANKRUPTCY COURT DATED MAY 25, 2004, ("ADMINISTRTATIVE CLAIMS BAR DATE ORDER") THE DEADLINE TO FILE PROOFS OF ADMINISTRATIVE EXPENSE CLAIMS AND REQUESTS FOR PAYMENT OF ADMINISTRATIVE EXPENSE CLAIMS THAT AROSE PRIOR TO MAY 17, 2004, IS JULY 2, 2004, EXCEPT AS OTHERWISE SET FORTH IN THE ADMINISTRATIVE CLAIMS BAR DATE ORDER.

PROOFS OF ADMINISTRATIVE EXPENSE CLAIMS AND REQUESTS FOR PAYMENT OF ADMINISTRATIVE EXPENSE CLAIMS THAT HAVE ARISEN AFTER MAY 16, MUST BE FILED AND SERVED PURSUANT TO THE PROCEDURES SET FORTH IN THE CONFIRMATION ORDER OR NOTICE OF ENTRY OF CONFIRMATION ORDER, NO LATER THAN THIRTY (30) DAYS AFTER THE EFFECTIVE DATE.

Notwithstanding anything to the contrary herein, no proof of Administrative Expense Claim or application for payment of an Administrative Expense Claim that arose or arises after May 16, 2004, need be filed for the allowance of any:  (i) Professional Fee Claims; or (ii) fees of the U.S. Trustee arising under 28 U.S.C. § 1930.  All Claims described in clause (i) and (ii) of the immediately preceding sentence shall be paid by the Debtor in accordance with the terms of the Plan.

\\\Case 5:03-bk-01802    Doc 2594    Filed 07/09/04    Entered 07/09/04 17:27:15    Desc
Main Document      Page 29 of 61

Any Persons that fail to file a proof of Administrative Expense Claim or request for payment thereof on or before the applicable Administrative Bar Date as required herein or in the Administrative Claims Bar Date Order shall be forever barred from asserting such Claim against any of the Debtor, the Estate, or its property and the holder thereof shall be enjoined from commencing or continuing any action, employment of process or act to collect, offset or recover such Administrative Expense Claim.

<div align="center">3.       <u>Compensation and Reimbursement Claims</u>.</div>

All entities seeking an award by the Bankruptcy Court of compensation for services rendered or reimbursement of expenses incurred through and including the Confirmation Date under sections 327, 328, 330, 331, 503(b)(2), 503(b)(3), 503(b)(4), or 503(b)(5) of the Bankruptcy Code (i) shall file their respective final applications for allowance of compensation for services rendered and reimbursement of expenses incurred by the date that is thirty (30) days after the Confirmation Date, and (ii) shall be paid in full in such amounts as are allowed by the Bankruptcy Court (A) upon the date upon which the order relating to any such Administrative Expense Claim is entered, or (B) upon such other terms as may be mutually agreed upon between the holder of such an Administrative Expense Claim and the Debtor.

<div align="center">4.       <u>U.S. Trustee</u>.</div>

Pursuant to 28 U.S.C. §1930(a)(6), a debtor is obligated to continue paying statutory quarterly fees to the U.S. Trustee post-confirmation until the case is closed, dismissed or converted. Weirton will continue to be responsible for making such statutory quarterly payments and submitting appropriate financial reports to the U.S. Trustee until the Bankruptcy Case is closed.

<div align="center">5.       <u>Priority Tax Claims</u>.</div>

Except to the extent that a holder of an Allowed Priority Tax Claim agrees to a different treatment, on the Effective Date, or as soon thereafter as is reasonably practicable, the Debtor shall pay to each holder of an Allowed Priority Tax Claim, after payment of up to $6.0 million to Class 2 Claims (including the Bonus Pool, as defined below), the greater of a Pro Rata Share of all available cash or an amount in Cash equal to the Allowed amount of such Claim.

**C.      Classification and Treatment of Allowed Claims and Equity Interests**

The Plan divides Allowed Claims against and Allowed Equity Interests in the Debtor into various classes that the Debtor believes are in accordance with the classification requirements established by the Bankruptcy Code. Distribution of Cash to the holders of Allowed Claims and Allowed Equity Interests under the Plan are in full satisfaction of such Allowed Claims (including any and all interest or costs accrued and allowable thereon) and Allowed Equity Interests. All Claims against and Equity Interests in the Debtor arising prior to the Commencement Date will be discharged under the Plan on the Effective Date of the Plan to the extent provided in the Plan or the Confirmation Order.

A summary of the classification and treatment of Allowed Claims and Allowed Interests under the Plan is set forth below.

<div align="center">1.       <u>Class 1: Other Secured Claims</u></div>

<u>Distribution</u>: On or as soon as reasonably practicable after the Effective Date, each holder of an Allowed Other Secured Claim shall receive, at the option of the Debtor, and in full satisfaction of such Claim, either (i) Cash in an amount equal to one hundred percent (100%) of the unpaid amount of such

<div align="center">24</div>

Allowed Other Secured Claim, (ii) the proceeds of the sale or disposition of the Collateral securing such Allowed Other Secured Claim to the extent of the value of the holder's secured interest in the Allowed Other Secured Claim, net of the costs of disposition of such Collateral, or (iii) such other distribution as necessary to satisfy the requirements of the Bankruptcy Code. In the event the Debtor treats a Claim under clause (i) or (ii) of this Section 4.1, the liens securing such Other Secured Claim shall be deemed released.

**Class 1 is unimpaired under the Plan. Each holder of an Allowed Class 1 Claim is conclusively presumed to have accepted the Plan, and, consequently, is not entitled to vote to accept or reject the Plan.**

2.    Class 2:  Note and Bond Claims

Distribution:  In addition to the $30.0 million paid by the Debtor with respect to Allowed Class 2 Claims on the Closing Date, in accordance with the Settlement and Lockup Agreement, after payment by the Debtor of all Allowed Administrative Expense Claims under Section 2.1, including compensation and reimbursement claims under Section 2.2, and after the Debtor has liquidated all of its remaining assets that are reasonably able to be liquidated, the Debtor shall pay the lesser of Six Million ($6,000,000) Dollars, less 10% of the recovery by Class 2 claimants between $32 million and $36 million (the "Bonus Pool"), or all remaining assets in the Debtor's Estate, less the Bonus Pool, to the order of J.P. Morgan for the benefit of Class 2 Claims.  To the extent practical, the Debtor may make earlier distributions consistent with the needs of the Debtor's Estate.

Incorporation by Reference of Settlement and Lockup Agreement:  The Settlement and Lockup Agreement is attached to this Plan and incorporated herein by reference as Exhibit 1.  To the extent any provision of the Settlement and Lockup Agreement conflicts with any provision of this Plan, the terms and conditions of the Settlement and Lockup Agreement shall control.

Cancellation of Notes, Bonds and Related Instruments:  As of the Effective Date, all Notes, Bonds, security agreements, deeds of trust, collateral agency agreements and all indentures, agreements, instruments and other documents evidencing or securing the Note and Bond Claims and the rights of holders thereof, including, without limitation, the Secured Indentures, shall be cancelled and deemed null and void and of no further force and effect (all without further act or action), and all obligations of any Person (including, without limitation, J.P. Morgan as the indenture trustee to the Notes and Bonds) under such instruments and agreements shall be fully satisfied and released.  Notwithstanding the foregoing, such cancellation shall not impair the rights and duties under the Secured Indentures as among the respective indenture trustees to the Notes, the Bonds and the beneficiaries of the trusts created thereby.

Reporting Requirements:  Pursuant to the Settlement and Lockup Agreement, Weirton and a subcommittee ("Subcommittee") of the Informal Committee agreed upon the post-Closing Date reporting requirements of Weirton, which generally include information relating to expenditures during the winddown period, administrative claims status and revenue received by the Debtor's Estate on a post-Closing Date basis.  Weirton and the Subcommittee also agreed to a 24 to 30 week static budget for the winddown period, excluding the projected fees and expenses of McGuireWoods LLP (the "Budget"). Following the Closing Date, on a weekly basis, Weirton is obligated to provide to the Subcommittee a rolling four week forecast measured against the Budget.  The Debtor shall meet and confer with the Subcommittee at reasonable times in order to discuss information reported by the Debtors.  Weirton's reporting requirements under Section 22 of the Settlement and Lockup Agreement shall continue until Class 2 Claims are paid in full or the Liquidating Trustee has disbursed all of the assets of the Liquidating Trust, whichever occurs first.

**Class 2 is impaired under the Plan. Holders of Allowed Class 2 Claims are entitled to vote to accept or reject the Plan**

3.    Class 3:  Priority Non-Tax Claims

Distribution:  Except to the extent that a holder of an Allowed Priority Non-Tax Claim against the Debtor agrees to a different treatment of such Claim, on the Effective Date, or as soon thereafter as is reasonably practicable, each such holder shall receive a Pro Rata Share of all remaining Cash after payment of all Allowed Claims in sections 2.1, 2.2, 2.3, 4.1 and 4.2, on the Effective Date or as soon thereafter as is practicable.

**Class 3 is impaired under the Plan. Holders of Allowed Class 3 Claims are entitled to vote to accept or reject the Plan.**

4.    Class 4:  General Unsecured Claims

Distribution:   The holders of Allowed General Unsecured Claims shall receive their Pro Rata Share of all remaining Cash after payment in full of all Allowed Claims in Sections 2.1, 2.2, 2.3, 4.1, 4.2 and 4.3 of the Plan, on the Effective Date or as soon thereafter as is practicable.

Cancellation of Unsecured Notes, Unsecured Bonds and Related Instruments:  As of the Effective Date, all Unsecured Notes, Unsecured Bonds, and all indentures, agreements, instruments and other documents evidencing the Unsecured Note and Unsecured Bond Claims and the rights of holders thereof, including, without limitation, the Unsecured Indentures, shall be cancelled and deemed null and void and of no further force and effect (all without further act or action), and all obligations of any Person (including, without limitation, the Indenture Trustees under the Unsecured Indentures) under such instruments and agreements shall be fully satisfied and released, provided, however, that the Unsecured Notes and Bonds and the Unsecured Indentures shall continue in effect solely for the purposes of (i) allowing the holders of the Unsecured Notes and the Unsecured Bonds to receive their distributions hereunder, (ii) allowing the Indenture Trustees under the Unsecured Indentures to make the distributions, if any, to be made on account of the Unsecured Notes and the Unsecured Bonds, and (iii) permitting the Indenture Trustees under Unsecured Indentures to assert charging liens against such distributions.

**Class 4 is impaired under the Plan. Holders of Allowed Class 4 Claims are entitled to vote to accept or reject the Plan**

5.    Class 5:  Equity Interests

Treatment: All Equity Interests issued by Weirton shall be cancelled on the Effective Date.  Each holder of an Equity Interest shall neither receive nor retain any property or interest in property on account of such Equity Interest. On or promptly after the Effective Date, Weirton will file with the United States Securities and Exchange Commission a Form 15 for the purpose of terminating the registration of any of its publicly traded securities.

**Class 5 is impaired under the Plan, and the holders of Allowed Class 5 Equity Interests are deemed to reject the Plan.  Consequently, holders of Allowed Class 5 Equity Interests are not entitled to vote to accept or reject the Plan.**

### D.     Claims Bar Date

On or about August 27, 2003, the Bankruptcy Court entered the Order under Fed.R.Bankr.P. 3003(c)(3)(i) Setting a Final Date For Filing Proofs of Claim, and (ii) Approving Form and Manner of Notice (the "Bar Date Order"), which established a Claims Bar Date for the filing of proofs of claim or interest for all creditors of the Debtor, including, without limitation, holders of executory contracts and unexpired leases of the Debtor (other than for Administrative Expense Claims) of October 20, 2003, at 5:00 p.m. (New York Time) ("Bar Date") and on or before November 17, 2003, for governmental units. Paragraph 16 of the Bar Date Order provides:  "Any Person or Entity that is required to file a proof of claim in this chapter 11 case but fails to do so in a timely manner shall be forever barred, estopped, and enjoined from:  (a) asserting any claim against the Debtor that such Person or Entity has that (i) is in an amount that exceeds the amount, if any, that is set forth in the Schedules, or (ii) is of a different nature or in a different classification (any such claim referred to as an "Unscheduled Claim"), and (b) voting upon, or receiving distributions under, any plan or plans of reorganization in this chapter 11 case in respect of an Unscheduled Claim."  Accordingly, to the extent a proof of claim was not filed by the applicable bar date, such Claim shall not be an "Allowed Claim" as defined in the Plan.

### E.     Treatment and Status of Certain Claims

#### 1.     Environmental Claims

The Debtor's operations were subject to a variety of federal, state and local environmental, worker safety and health laws and regulations, including those relating to air emissions, waste water discharges, the handling and disposal of solid and hazardous wastes and toxic substances and the release of hazardous substances.  Those laws and regulations include the Federal Clean Air Act, Clean Water Act, Toxic Substances Control Act, Resource Conservation and Recovery Act ("RCRA"), Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA"), and analogous state and local laws.  As of August 31, 2003, the Debtor had total book reserves of approximately $9 million relating to future costs arising from known environmental liabilities for investigation, remediation and operation and maintenance of remediation systems, including costs relating to its own properties and to certain sites at which the Debtor's wastes have allegedly been identified.  With the exception of the matters listed below, the Debtor maintains that its operations as of the Closing Date were generally in material compliance with all applicable environmental regulations and permitting requirements.  The Debtor's position, however, is not based upon any finding or determination by any court or any federal or state governmental agency, although the Debtor is not aware that such finding or determination by any court or any federal or state governmental agency is required as a matter of law.  The U.S. Environmental Protection Agency ("EPA") and the West Virginia Department of Environmental Protection ("WVDEP") maintain that the Plan must provide for the Debtor's compliance with environmental regulatory obligations under applicable permits and the law.

(a)     *Off-site environmental matters.*  The Debtor and the WVDEP dispute the manner in which an off-site landfill, the Shiloh Landfill, is to be treated.  The Debtor maintains that its performance obligations and responsibilities under that certain Consent Order and Agreement with Weirton and the Shiloh River Corporation ("SRC") in 1997 ("Shiloh Landfill COA") are Claims properly classified as Class 4 General Unsecured Claims, while the WVDEP alleges that the debtor is subject to continuing and non-dischargeable injunctive obligations and responsibilities.  The WVDEP has appealed the Sale Order, asserting that the Sale Order was entered in error regarding (i) the treatment and priority of the Debtor's obligations regarding the Shiloh Landfill; (ii) the applicability and impact of 28 U.S.C. § 959(b) regarding compliance with state law; (iii) the alleged *de facto* abandonment of the Shiloh Landfill; (iv) the extent of the Bankruptcy Court's jurisdiction with respect to the 14th Amendment of the U.S.

27

Constitution and sovereign immunity issues. Further, the WVDEP has attempted to reissue the permit to Weirton as co-permittee with respect to the Shiloh Landfill, and Weirton has appealed the reissuance of that permit with the West Virginia Environmental Quality Board. Weirton made a settlement proposal to the WVDEP that would have resolved both appeals, however, the WVDEP rejected the Weirton settlement proposal and did not make a counterproposal.

The following is a summary of the significant environmental matters in which the Debtor is currently involved at non-company owned sites:

Brooke County Landfill (Brooke Co., WV). Since October 1998, Solid Waste Service, Inc. ("Solid Waste") has provided non-hazardous waste transportation, stabilization and disposal services for Weirton. Weirton also leased a dedicated industrial waste cell from Valero Terrestrial Corporation ("Valero"), an affiliate of Solid Waste, for the exclusive disposal of non-hazardous wastes. On January 24, 2003, Solid Waste and Valero signed a Consent Order and Agreement ("Brooke County Landfill COA") with the West Virginia Department of Environmental Protection ("WVDEP") regarding compliance issues at the landfill including requirements and deadlines for work on the Weirton cell. Solid Waste and Valero have failed to comply with the Brooke County Landfill COA according to June 19, 2003 correspondence from the WVDEP. At this time, the WVDEP has not given any notice to Weirton with respect to any liability for this site.

Shiloh Landfill (Hancock Co., WV). From 1984 to 1998, the SRC operated and leased the Shiloh Landfill, a private landfill, to Weirton under an exclusive-use lease agreement for Weirton's non-hazardous waste disposal. The WVDEP entered into the Shiloh Landfill COA that established post-closure requirements for the landfill as obligations of "SRC and/or Weirton". The landfill was closed pursuant to the Shiloh Landfill COA in June 1999. The Shiloh Landfill COA and the facility's state-issued wastewater discharge permit, which identifies SRC and Weirton as co-permittees, require groundwater and surface water monitoring and reporting, landfill inspections and maintenance of the landfill's structural components. Post-closure activities must be maintained through June 2029. The extent, if any, of Weirton's obligations with respect to the Shiloh Landfill are subject to dispute between Weirton and the WVDEP, and the parties are engaged in settlement discussions with respect to such dispute.

(b)     *On-site environmental matters.* Because the Chapter 11 Case is a liquidating case, Weirton expects to own no real property as of the Effective Date. Each agreement of sale pursuant to which real property was sold, transferred and conveyed contains a specific provision relating to the respective acquirer's assumption of ongoing environmental obligations. The EPA asserts that the sale of real property and corresponding assumption of environmental obligations by each respective purchaser does not relieve Weirton of obligations and responsibilities under the 1996 Consent Decree and 1996 Final Administrative Order ("1996 FAO"). Any "Claim" within the meaning of section 101(5) of the Bankruptcy Code that is not an Administrative Expense Claim, with respect to the property that is subject to the ISG Agreement, shall be treated as a General Unsecured Claim under Class 4 of the Plan. Further, in connection with the Sale Transaction and subject to the terms of the Sale Order, the Buyer assumed all environmental obligations related to real property that it acquired from Weirton. With respect to the real property that Weirton has sold or will sell to other purchasers, such parcels will be sold "as-is, where-is" and the purchasers of such property will be responsible for all related environmental obligations. Notwithstanding the foregoing, it is the position of the EPA that Weirton remains subject to injunctive provisions of the 1996 Consent Decree and the 1996 FAO.

The EPA and WVDEP take the position that, as a matter of law, Weirton, despite having sold all real property owned by the Estate subject to ongoing environmental obligations, remains obligated and

responsible for injunctive provisions under the 1996 Consent Decree and the 1996 FAO. To the extent that such injunctive provisions are not reducible to claims, as defined by section 101(5) of the Bankruptcy Code, Weirton agrees with the position of the WVDEP and the EPA. However, as a practical matter, all purchasers of real property formerly owned by Weirton and subject to the 1996 Consent Decree and/or the 1996 FAO have assumed such ongoing environmental obligations and responsibilities, and likewise, the Debtor will cease to exist as of the Effective Date.

2.    Tort and Litigation Claims

The Debtor is a party to a variety of legal proceedings and administrative actions. Significant categories of legal actions pending against the Debtor are summarized below:

(a)    Asbestos Actions. The Debtor is a defendant in at least five asbestos-related lawsuits, including one class action lawsuit.

(b)    Other Personal Injury Actions. The Debtor is a defendant in a number of individual personal injury cases at various stages of resolution. These cases fall into two categories:

(i)    Personal injury claims brought by individuals who are not employed by Weirton, or that are not work-related; and

(ii)    Personal injury claims brought by Weirton employees for work-related injuries pursuant to the deliberate intention exception to West Virginia's Workers' Compensation Act ("Mandolidis Claims").

(c)    Employee Related Litigation. In addition to the Mandolidis Claims, the Debtor is a defendant in various employment litigation matters, including but not necessarily limited to: (i) discrimination claims and claims under the Americans with Disabilities Act; (ii) various union lawsuits, administrative proceedings and grievances asserted for wrongful termination, overtime pay, and other complaints; (iii) unemployment compensation claims; (iv) workers' compensation claims; and (v) at least one ERISA claim.

Unless otherwise stated in the Plan, such claims, when and if Allowed, will be included in Class 4.

3.    Insurance Claims.

Notwithstanding the foregoing, all Insurance Claims that arose prior to the Commencement Date shall be deemed Allowed General Unsecured Claims in the greater of (i) an amount equal to (x) the amount of any remaining self-insured retention under the Insurance Policy applicable to such Insurance Claim, divided by (y) the number of Insurance Claims to which the applicable Insurance Policy and self-insured retention applies, or (ii) $0.00. The allowance of an Insurance Claim pursuant to this provision shall not be deemed an admission of liability by Weirton, or a waiver of any counterclaims, setoffs or other rights or defenses and therefore shall not be conclusive as to Weirton's liability in any proceeding by the holder of an Insurance Claim against an Insurer.

4.    West Virginia Workers' Compensation Commission Claim

Pursuant to the West Virginia Statutes, Chapter 23, West Virginia requires all employers operating in the State of West Virginia to participate in the state's system for payment of workers'

compensation claims. The West Virginia Statutes require that all employers either (a) subscribe to a workers' compensation fund (the "Fund") to which payments are made by employers and from which employee workers' compensation claims are paid or (b) self-insure against workers' compensation claims. Weirton was authorized by the West Virginia Workers' Compensation Commission ("Commission") to self-insure against workers' compensation claims. Accordingly, Weirton did not subscribe to the Fund, but made payments directly on workers' compensation claims through a third party administrator.

Even though Weirton, as a self-insured employer, was not required to subscribe to the Fund, it was required to make certain payments, referred to as a "self-insured premium tax," to the Fund. A portion of the "self-insured premium tax" includes the payment in the ordinary course of employee workers' compensation claims by Weirton. As a self-insured employer, Weirton also was required to maintain a bond sufficient in amount to assure payment of outstanding workers' compensation claims.

Under the West Virginia Statutes, to the extent that an employer that is self-insured for workers' compensation fails to timely pay the "self-insured premium tax" to the Fund, which would include a failure to pay any employee workers' compensation claim, as and when due, the Commission is authorized to determine "the full accrued value based upon generally accepted actuarial and accounting principles of the employer's liability including the costs of all awarded claims and of all incurred but not reported claims." The Commission can then assess this amount against an employer and demand to collect the present value of the defaulted liability.

Weirton was authorized but not required pursuant to a first day order to continue the self-insured workers' compensation program, and pay all costs associated therewith, including prepetition claims and processing costs. As of the Closing Date, Weirton was current with payment of all workers' compensation claims that had been filed by employees. Weirton was also current with all "self-insured premium taxes" and other charges due to the workers' compensation Fund. Self-insured employers in the State of West Virginia are required to provide the Fund collateral as surety for performance of a self-insured employer's obligations to workers' compensation claimants. Currently, a third party has issued surety bonds to the Fund on behalf of Weirton in the approximate amount of $10 million.

The Commission has calculated Weirton's estimated undiscounted value of outstanding liability for workers' compensation claims, including future claims, to be approximately $110 million, with an approximate present value of $59.9 million. Weirton does not agree with these calculations, and believes that its estimated workers compensation obligations are substantially less than that calculated by the Fund, or approximately $34.4 million. The basis for this dispute results from Weirton's belief that its estimates more properly reflect its actual rate and payment of claims. Weirton asserts that the Commission's estimated claim amount results from standard actuarial calculations that are not consistent with Weirton's historical workers' compensation liabilities while Weirton's estimate of its obligations is based on actual historical rates and payments of claims.

Pursuant to the Sale Order, the Buyer purchased Weirton's assets free of any and all of Weirton's obligations under the Act. On and since the Closing Date, Weirton no longer had any employees and is therefore no longer subject to the requirements of the West Virginia Workers' Compensation Act (the "Act") and related regulations. Accordingly, on the Closing Date Weirton ceased all payments of workers' compensation claims and other obligations under the Act. The Commission has appealed the Sale Order and raised the following issues on appeal:

· Whether the Bankruptcy Court had jurisdiction to approve the Sale Transaction?

· Whether the Bankruptcy Court had jurisdiction to relieve the Buyer of future obligations that it may incur as a West Virginia employer arising out of Weirton's Chapter 11 Case?

· Whether the Bankruptcy Court properly released the Buyer of successor liability under the Act?

Because all of the issues on appeal either relate to the Buyer's liability for Weirton's obligations under the Act or the Buyer's future responsibility under the Act as an employer, an adverse appellate ruling would have no adverse economic impact on Weirton or its Estate, but it could reduce the amount of the liabilities to the Commission for which Weirton might otherwise be held responsible. Weirton and the Commission have settled all disputes and expect to file with the Bankruptcy Court a motion to approve a settlement and compromise pursuant to Bankruptcy Rule 9019 in the immediate future. As part of the settlement, the Commission will withdraw its appeal of the Sale Order.

### 5. Collective Bargaining Agreements, Employee Benefits, Retiree Benefits and Modifications Thereto

As set forth in Subsection K of Section V above, as of the Commencement Date the Debtor was a party to collective bargaining agreements with the ISU and IGU. These collective bargaining agreements were terminated with the consent of the ISU and IGU, as applicable, subject to the Effects Bargaining Agreements. Weirton also terminated its retiree benefits as set forth in Subsection I of Section V above. Weirton believes that it has satisfied all postpetition monetary obligations under the collective bargaining agreements, the Effects Bargaining Agreements, and in connection with its termination of retiree benefits. Accordingly, all Claims arising out of, in connection with or relating to the foregoing are General Unsecured Claims subject to the treatment of Class 4 Claims.

### 6. Reclamation Claims

On July 1, 2003, the Bankruptcy Court entered an order governing the treatment of reclamation claims (the "Reclamation Order"). Under the Reclamation Order, the reclamation demands of creditors for the return of goods were denied as to all claims, and valid reclamation claims are Allowed Administrative Expense Claims. Reclamation claims determined to be invalid will constitute General Unsecured Claims to be included in Class 4 of the Plan.

The Reclamation Order required the Debtor to file a report, identifying those reclamation demands it recognized as valid, and those that were invalid (the "Reclamation Report"). On July 16, 2003, the Debtor filed the Reclamation Report. The Reclamation Report recognized valid claims of various creditors in the total amount of $75,074.89, and listed invalid reclamation claims in the total amount of $3,965,862.78. Fourteen reclamation claimants filed objections to the Reclamation Report, and three claimants raised informal objections. After discussions with various objecting reclamation claimants, on August 25, 2003, the Debtor filed a Supplemental Reclamation Report, which superseded the first Reclamation Report. By Order dated August 26, 2003, the Bankruptcy Court disallowed $2,252,938.09 in reclamation claims and allowed $107,176.22 in valid reclamation claims. On April 19, 2004, the Debtor filed an Omnibus Motion to Approve Settlement of Reclamation Claims, which the Bankruptcy Court approved on May 25, 2004, thus allowing an additional $230,525.16 in reclamation claims, and leaving four reclamation claims totaling $236,729.54 subject to dispute in whole or in part, $30,400 of which the Debtor does not contest.

### F. Confirmation Hearing

The Bankruptcy Court will hold the Confirmation Hearing at the following time and place:

<table>
<tr><td align="center"><strong>Confirmation Hearing</strong></td></tr>
<tr><td><strong>Date and Time:</strong> Commencing at 9:00 a.m. (Eastern time), on [_____], 2004.</td></tr>
<tr><td><strong>Place:</strong> The United States Bankruptcy Court, Northern District of West Virginia, Bankruptcy Courtroom, Third Floor, United States Federal Building & Courthouse, 12th and Chapline Streets, Wheeling, West Virginia 26003.</td></tr>
<tr><td><strong>Judge:</strong> The Honorable L. Edward Friend, II</td></tr>
<tr><td>The Confirmation Hearing may be adjourned from time to time on announcement in the Bankruptcy Court on the scheduled date for the hearing. No further notice will be required to adjourn the hearing.</td></tr>
</table>

At the Confirmation Hearing, the Bankruptcy Court will:

- determine whether sufficient majorities in number and dollar amount, as applicable, from each Voting Class have delivered properly executed votes accepting the Plan to approve the Plan;

- hear and determine objections, if any, to the Plan and to confirmation of the Plan that have not been previously disposed of;

- determine whether the Plan meets the confirmation requirements of the Bankruptcy Code; and

- determine whether to confirm the Plan.

Any objection to confirmation of the Plan must be in writing and filed and served as required by the Bankruptcy Court under the order approving this Disclosure Statement. That order requires any objections to the confirmation of the Plan to be served so as to be received on or before 4:00 p.m. on [_____], 2004, by the following persons:

- Counsel for the Debtor, McGuireWoods LLP, Dominion Tower, 625 Liberty Avenue, 23rd Floor, Pittsburgh, Pennsylvania 15222-3142, Attn: Mark E. Freedlander, Esq.;

- Co-Counsel for the Debtor, Bailey, Riley, Buch & Harman, L.C., Riley Building, 53 – 14th St., Suite 900, Wheeling, West Virginia 26003-0081, Attn: Arch W. Riley, Jr., Esq.;

- The Office of the United States Trustee for the Northern District of West Virginia, 2025 United States Courthouse, 300 Virginia Street East, Charleston, West Virginia 25301, Attn: Debra A. Wertman, Esq.;

- Counsel for the Creditors' Committee, Blank Rome, LLP, The Chrysler Building, 405 Lexington Avenue, New York, New York 10174, Attn: Marc E. Richards, Esq.;

- Co-Counsel for the Creditors' Committee, Campbell & Levine, LLC, Grant Bldg., 310 Grant Street, Suite 1700, Pittsburgh, Pennsylvania 15219, Attn: David B. Salzman, Esq.;

- Counsel for the Retirees' Committee, Klett Rooney Lieber & Schorling, P.C., 40th Floor, One Oxford Centre, Pittsburgh, Pennsylvania 15219, Attn: James D. Newell, Esq.;

- Counsel for the ISU, Pietragallo Bosick & Gordon, 38th Floor, One Oxford Centre, Pittsburgh, Pennsylvania 15219-1407, Attn: Richard A. Pollard, Esq.; and

- Counsel for Informal Committee, Akin Gump Strauss Hauer & Feld, LLP, 590 Madison Avenue, New York, New York 10022, Attn: Lisa G. Beckerman, Esq.

- Counsel for the J.P. Morgan Trust Company, National Association, as Trustee and Collateral Agent, Reed Smith LLP, 435 Sixth Avenue, Pittsburgh, PA 15219, Attn: Eric A. Schaffer, Esq.

**G.     Cancellation of Existing Securities and Agreements**

On the Effective Date, except as expressly provided in the Plan, the securities, promissory notes (including the Notes, Bonds, Unsecured Notes and Unsecured Bonds), trust indentures (including the Secured Indentures and the Unsecured Indentures), share certificates, security agreements, deeds of trust, collateral agency agreement and other instruments evidencing or securing a Claim or Equity Interest shall be deemed cancelled without further act or action under any applicable agreement or Law, and the obligations of the Debtor under the agreements, instruments, trust indentures and certificates governing or securing such Claims and Equity Interests, as the case may be, shall be discharged.

Without limiting the foregoing, as of the Effective Date, all Notes, Bonds, Unsecured Notes, Unsecured Bonds, and all indentures, agreements, instruments and other documents evidencing the Note and Bond Claims and the Unsecured Note and Unsecured Bond Claims and the rights of holders thereof, including, without limitation, the Secured Indentures and the Unsecured Indentures, shall be cancelled and deemed null and void and of no further force and effect (all without further act or action), and all obligations of any Person (including, without limitation, J.P. Morgan as the indenture trustee under the Secured Indentures, and the Indenture Trustees under the Unsecured Indentures) under such instruments and agreements shall be fully satisfied and released. Notwithstanding the foregoing, such cancellation shall not impair the rights and duties under the Secured Indentures and the Unsecured Indentures as among the respective Indenture Trustees to the Notes, the Bonds, the Unsecured Notes and the Unsecured Bonds and the beneficiaries of the trusts created thereby.

**H.     Means of Executing the Plan**

1.     Liquidating Trust

(a)     Execution of Trust Agreement. On the Effective Date, the Trust Agreement shall be executed, and all other necessary steps shall be taken to establish the Liquidating Trust and the beneficial interests therein, which shall be for the benefit of all creditors and parties in interest entitled to receive a distribution under the Plan. Section 6.1 of the Plan sets forth certain of the rights, duties, and obligations of the Trustee. In the event of any conflict between the terms of Section 6.1 of the Plan and the terms of the Trust Agreement, the terms of the Trust Agreement shall govern.

(b)     Purpose of Liquidating Trust. The Liquidating Trust shall be established

33

for the sole purpose of liquidating and distributing its assets, in accordance with Treasury Regulation section 30.1.7701-4(d), with no objective to continue or engage in the conduct of a trade or business.

(c)     Liquidating Trust Assets.  The Liquidating Trust shall consist of the Liquidating Trust Assets. Any Cash or other property received from third parties from the prosecution, settlement, or compromise of any Cause of Action or otherwise shall constitute Liquidating Trust Assets for purposes of distributions under the Liquidating Trust. On the Effective Date, the Liquidating Trust Assets shall automatically vest in the Liquidating Trust as set forth in Section 10.1 of the Plan, free and clear of all Liens, Claims and encumbrances, except to the extent otherwise provided herein.

(d)     Governance of Liquidating Trust.  The Liquidating Trust shall be governed by the Liquidating Trustee in accordance with the Trust Agreement and consistent with the Plan.

(e)     The Liquidating Trustee.  The Liquidating Trustee shall be designated on or before the Effective Date by the Debtor. The designation of the Liquidating Trustee shall be effective on the Effective Date without the need for a further order of the Bankruptcy Court.  Robert C. Fletcher, the Debtor's current Authorized Agent, is eligible to be selected as the Liquidating Trustee.

(f)     Nontransferability of Liquidating Trust Interests.  The beneficial interests in the Liquidating Trust shall not be certificated and are not transferable (except as otherwise provided in the Trust Agreement).

(g)     Cash.  The Trustee may invest Cash (including any earnings thereon or proceeds therefrom) as permitted by section 345 of the Bankruptcy Code; provided, however, that such investments are investments permitted to be made by a liquidating trust within the meaning of Treasury Regulation section 301.7701-4(d), as reflected therein, or under applicable Internal Revenue Service guidelines, rulings, or other controlling authorities.

(h)     Costs and Expenses of the Liquidating Trustee.  The costs and expenses of the Liquidating Trust, including the fees and expenses of the Liquidating Trustee and its retained professionals, shall be paid out of the Liquidating Trust Assets. Such costs and expenses shall be considered administrative expenses of the Debtor's estates.

(i)     Compensation of the Liquidating Trustee.  The Liquidating Trustee shall be entitled to reasonable compensation, which shall be on the same economic terms as the compensation previously authorized by the Bankruptcy Court to be paid to the Authorized Agent.

(j)     Distribution of Liquidating Trust Assets.  The Liquidating Trustee shall distribute at least annually and in accordance with the Trust Agreement, beginning on the Effective Date or as soon thereafter as is practicable, the Liquidating Trust Assets on hand (including any Cash received from the Debtors on the Effective Date, and treating as Cash for purposes of this Section 6.2 any permitted investments under Section 6.2(h) hereof), except such amounts (i) as would be distributable to a holder of a Disputed Claim if such Disputed Claim had been Allowed prior to the time of such distribution (but only until such Claim is resolved), (ii) as are reasonably necessary to meet contingent liabilities and to maintain the value of the Liquidating Trust Assets during liquidation, (iii) to pay reasonable expenses (including, but not limited to, any taxes imposed on the Liquidating Trust or in respect of the Liquidating Trust Assets), and (iv) to satisfy other liabilities incurred by the Liquidating Trust in accordance with this Plan or the Trust Agreement.

34

(k)     Retention of Professionals by the Liquidating Trustee. The Liquidating Trustee may retain and reasonably compensate counsel and other professionals to assist in its duties as Liquidating Trustee on such terms as the Liquidating Trustee deems appropriate without Bankruptcy Court approval. The Liquidating Trustee may retain any professional who represented parties in interest (including the Debtor) in the Chapter 11 Case.

(l)     Federal Income Tax Treatment of Liquidating Trust.

(i)     *Liquidating Trust Assets Treated as Owned by Creditors*. For all federal income tax purposes, all parties (including, without limitation, the Debtor, the Liquidating Trustee, and the holders of beneficial interests in the Liquidating Trust) shall treat the transfer of the Liquidating Trust Assets to the Liquidating Trust for the benefit of the beneficiaries thereof, whether Allowed on or after the Effective Date, as (A) a transfer of the Liquidating Trust Assets directly to the holders of satisfaction of such Claims (other than to the extent allocable to Disputed General Unsecured Claims) followed by (B) the transfer by such holders to the Liquidating Trust of the Liquidating Trust Assets in exchange for beneficial interests in the Liquidating Trust. Accordingly, the holders of such Claims shall be treated for federal income tax purposes as the grantors and owners of their respective shares of the Liquidating Trust Assets.

(ii)     *Tax Reporting*.

The Trustee shall file returns for the Liquidating Trust as a grantor trust pursuant to Treasury Regulation section 1.671-4(a) and in accordance with Section 6.1(l) of the Plan. The Trustee shall also annually send to each record holder of a beneficial interest a separate statement setting forth the holder's share of items of income, gain, loss, deduction, or ci. redit and will instruct all such holders to report such items on their federal income tax returns or to forward the appropriate information to the beneficial holders with instructions to report such items on their federal income tax returns. The Liquidating Trust's taxable income, gain, loss, deduction, or credit will be allocated (subject to Section 6.1(m)(ii)(c) of the Plan, relating to Disputed Claims) to the holders of Allowed General Unsecured Claims in accordance with their relative beneficial interests in the Liquidating Trust.

As soon as possible after the Effective Date, but in no event later than ninety (90) days after the Effective Date, the Trustee shall make a good faith valuation of the Liquidating Trust Assets. Such valuation shall be made available from time to time, to the extent relevant, and used consistently by all parties (including, without limitation the Debtors, the Trustee, and the holders of Allowed Claims) for all federal income tax purposes. The Trustee shall also file (or cause to be filed) any other statements, returns, or disclosures relating to the Liquidating Trust that are required by any governmental, unit.

Subject to definitive guidance from the Internal Revenue Service or a court of competent jurisdiction to the contrary (including the receipt by the Trustee of a private letter ruling if the Trustee so requests one, or the receipt of an adverse determination by the Internal Revenue Service upon audit if not contested by the Trustee), the Trustee shall (i) treat any Liquidating Trust Assets allocable to, or retained on account of, Disputed General Unsecured Claims as held by one or more discrete trusts for federal income tax purposes (the "Liquidating Trust Claims Reserve"), consisting of separate and independent shares to he established in respect of each Disputed General Unsecured Claim, in accordance with the trust provisions of the Tax Code (section 641 et seq.), (ii) treat as taxable income or loss of the Liquidating Trust Claims Reserve, with respect to any given taxable year, the portion of the taxable income or loss of the Liquidating Trust that would have been allocated to the holders of Disputed General Unsecured Claims had such Claims been Allowed on the Effective Date (but only for the portion of the taxable year with respect to which such Claims are unresolved), (iii) treat as a distribution from the

35

Liquidating Trust Claims Reserve any increased amounts distributed by the Liquidating Trust as a result of any Disputed General Unsecured Claims resolved earlier in the taxable year, to the extent such distributions relate to taxable income or loss of the Liquidating Trust Claims Reserve determined in accordance with the provisions hereof, and (iv) to the extent permitted by applicable law, report consistent with the foregoing for state and local income tax purposes. All holders of General Unsecured Claims shall report, for tax purposes, consistent with the foregoing.

The Trustee shall be responsible for payments, out of the Liquidating Trust Assets, of any taxes imposed on the Liquidating Trust or the Liquidating Trust Assets, including the Liquidating Trust Claims Reserve. In the event, and to the extent, any Cash retained on account of Disputed General Unsecured Claims in the Liquidating Trust Claims Reserve is insufficient to pay the portion of any such taxes attributable to the taxable income arising from the assets allocable to, or retained on account of, Disputed General Unsecured Claims, such taxes shall be (i) reimbursed from any subsequent Cash amounts retained on account of Disputed General Unsecured Claims, or (ii) to the extent such Disputed General Unsecured Claims have subsequently been resolved, deducted from any amounts distributable by the Trustee as a result of the resolutions of such Disputed General Unsecured Claims.

The Trustee may request an expedited determination of taxes of the Liquidating Trust, including the Liquidating Trust Claims Reserve, under section 505(b) of the Bankruptcy Code for all returns filed for, or on behalf of, the Liquidating Trust for all taxable periods through the dissolution of the Liquidating Trust.

(m)     Dissolution.  The Liquidating Trust and the Liquidating Trustee shall be discharged or dissolved, as the case may be, at such time as (i) all Disputed General Unsecured Claims have been resolved, (ii) all Liquidating Trust Assets have been liquidated, and (iii) all distributions required to be made by the Liquidating Trustee under the Plan have been made, but in no event shall the Liquidating Trust be dissolved later than twelve (12) months from the Effective Date unless the Bankruptcy Court, upon motion within the two (2) month period prior to the twelve (12) month anniversary (and, in the case of any extension, within two (2) months prior to the end of such extension), determines that a fixed period extension (not to exceed twelve (12) months, together with any prior extensions, without a favorable letter ruling from the Internal Revenue Service that any further extension would not adversely affect the status of the Liquidating Trust as a liquidating trust for federal income tax purposes) is necessary to facilitate or complete the recovery and liquidation of the Liquidating Trust Assets or the dissolution of Weirton. The Liquidating Trustee shall not unduly prolong the duration of the Liquidating Trust and shall at all times endeavor to resolve, settle or otherwise dispose of all claims that constitute Liquidating Trust Assets and to effect the distribution of the Liquidating Trust Assets in accordance with the terms hereof and terminate the Liquidating Trust as soon as practicable.  Prior to and upon termination of the Liquidating Trust, the Liquidating Trust Assets will be distributed to the beneficiaries of Liquidating Trust, pursuant to the provisions set forth in Section 3.6 of the Liquidating Trust and the Plan.

(n)     Indemnification of Liquidating Trustee.  The Liquidating Trustee or the individuals comprising the Liquidating Trustee, as the case may be, and the Liquidating Trustee's agents and professionals, shall not be liable for actions taken or omitted in its capacity as, or on behalf of, the Liquidating Trustee, except those acts arising out of its or their own willful misconduct, gross negligence, bad faith, self-dealing, breach of fiduciary duty, or ultra vires acts, and each shall be entitled to indemnification and reimbursement for fees and expenses in defending any and all of its actions or inactions in its capacity as, or on behalf of, the Liquidating Trustee, except for any actions or inactions involving willful misconduct, gross negligence, bad faith, self-dealing, breach of fiduciary duty; or ultra vires acts. Any indemnification claim of the Liquidating Trustee (and the other parties entitled to

36

indemnification under this subsection (o)) shall be satisfied first from the Trustee Expense Fund and then from the Liquidating Trust Assets. The Liquidating Trustee shall be entitled to rely, in good faith, on the advice of its retained professionals.

<div style="text-align:center">

2.     <u>Liquidating Trustee's Post-Confirmation Role; Dissolution.</u>

</div>

All rights and obligations of the Debtor under this Plan that continue on or after the Effective Date shall vest in the Liquidating Trustee and shall be rights and obligations exercisable by the Liquidating Trustee on and after the Effective Date.  Further, the Liquidating Trustee shall perform each of the following acts as soon as practicable on or after the Effective Date:

(a)     *General Powers*.  In furtherance of and consistent with the purpose of the Liquidating Trust and the Plan, the Liquidating Trustee shall (A) have the power and authority to hold, manage, sell, and distribute the Liquidating Trust Assets in accordance with the Plan, (B) have the power and authority to prosecute and resolve, in the name of the Debtor and/or the name of the Liquidating Trustee, the Causes of Action, (C) have the power and authority to prosecute and resolve objections to Disputed Claims, (D) have the power and authority to perform such other functions as are provided in the Plan, and (E) have the power and authority to administer the closure of the Chapter 11 Cases. The Liquidating Trustee shall be responsible for all decisions and duties with respect to the Liquidating Trust and the Liquidating Trust Assets. In all circumstances, the Liquidating Trustee shall act in the best interests of all beneficiaries of the Liquidating Trust and in furtherance of the purpose of the Liquidating Trust.

(b)     *Payments and Transfers*.  On the Effective Date, or as soon thereafter as is reasonably practicable, the Liquidating Trustee shall make payments and transfers to holders of Allowed Claims to claimants in the manner set forth at Sections 2.1, 2.2, 2.3, 4.1, 4.2, 4.3 and 4.4 hereof, and in accordance with Section 5.2 hereof.

(c)     *Administration of Taxes*.   After the certificate of cancellation, dissolution, or merger for the Debtor has been filed in accordance with Section 6.6(e) of the Plan, the Liquidating Trustee shall be authorized to exercise all powers regarding the Debtors' tax matters, including filing tax returns, to the same extent as if the Liquidating Trustee were the debtor in possession. The Liquidating Trustee shall (A) complete and file within ninety (90) days of the filing for dissolution by Weirton, to the extent not previously filed, the Debtors' final federal, state, and local tax returns, (B) request an expedited determination of any unpaid tax liability of the Debtor under section 505(b) of the Bankruptcy Code for all tax periods of the Debtor ending after the Commencement Date through the liquidation of the Debtor as determined under applicable tax laws, to the extent not previously requested, and (C) represent the interest and account of the Debtor before any taxing authority in all matters, including, but not limited to, any action, suit, proceeding, or audit.

(d)     *Claims Administration and Prosecution and Plan Distributions*.  The Liquidating Trustee shall have the power and authority to prosecute and resolve objections to Disputed Administrative Expense Claims, Disputed Priority Tax Claims, Disputed Other Secured Claims, and Disputed Priority Non-Tax Claims.  The Liquidating Trustee shall also have the power and authority to hold, manage, and distribute Plan distributions to the holders of Allowed Claims consistent with applicable provisions of this Plan.

Notwithstanding the foregoing, all Insurance Claims that arose prior to the Commencement Date shall be deemed Allowed in the greater of (i) an amount equal to (x) the amount of any remaining self-insured retention under the Insurance Policy applicable to such Insurance Claim, divided by (y) the

<div style="text-align:center">37</div>

number of Insurance Claims to which the applicable Insurance Policy and self-insured retention applies; and (ii) $0.00. The allowance of an Insurance Claim pursuant to this provision shall not be deemed an admission of liability by Weirton, and therefore shall not be conclusive as to Weirton's liability in any proceeding by the holder of an Insurance Claim against an Insurer.

(e)  *Dissolution*.  Upon the completion of the acts required by the Plan to create the Liquidating Trust and to appoint the Liquidating Trustee, the Debtor shall be deemed dissolved for all purposes without the necessity for any other or further actions to be taken by or on behalf of the Debtor; provided, however, that the Debtor shall file with the office of the Secretary of State of Delaware a certificate of cancellation or dissolution.

3.  Distribution Procedures

(a)  *Distributions to Holders as of the Distribution Record Date*.  As of the close of business on the Distribution Record Date, the Claims Register, the equity register and transfer and other registers as maintained by the Debtor and its respective agents, as applicable, will be closed and there will be no further changes in the record holder of any Claim or Equity Interest.  The Debtor will have no obligation to recognize any transfer of any Claim or Equity Interest occurring after the Distribution Record Date.  The Debtor will instead be authorized and entitled to recognize and deal for all purposes under the Plan with only those record holders stated on the Claims Register and equity register and other registers as of the close of business on the Distribution Record Date.

(b)  *Disbursing Agent*.  All distributions under the Plan will be made by the Disbursing Agent.  The Disbursing Agent will not be required to give any bond or surety or other security for the performance of its duties unless otherwise ordered by the Bankruptcy Court, and in the event that the Disbursing Agent is otherwise so ordered, all costs and expenses of procuring any such bond or surety will be borne by the Debtor.  The Disbursing Agent shall be empowered to (i) effect all actions and execute all agreements, instruments and other documents necessary to perform its duties under the Plan, (ii) make all distributions contemplated in the Plan, (iii) employ professionals to represent it with respect to its responsibilities under the Plan and (iv) exercise such other powers as may be vested in the Disbursing Agent by order of the Bankruptcy Court, pursuant to the Plan, or as deemed by the Disbursing Agent to be necessary and proper to implement the provisions of the Plan.  Except as otherwise ordered by the Bankruptcy Court, the amount of any reasonable fees and expenses incurred by the Disbursing Agent on or after the Effective Date (including without limitation, taxes) and any reasonable compensation and expense reimbursement claims (including, without limitation, reasonable attorneys' fees and other professional fees and expenses) made by the Disbursing Agent shall be paid in Cash by the Debtor.

(c)  *Delivery of Distributions*.  Subject to Bankruptcy Rule 9010, unless otherwise provided in the Plan, all distributions to any holder of an Allowed Claim will be made to the holder of each Allowed Claim at the address of such holder as listed in the Schedules, or on the books and records of the Debtor or its agents unless the Debtor has been notified, in advance, in writing of a change of address, including, without limitation, by the timely filing of a proof of claim or interest by such holder that provides an address for such holder different from the address reflected in the Schedules or in the Debtor's books and records.  In the event that any distribution to any holder is returned as undeliverable, no distribution to such holder will be made unless and until the Disbursing Agent has been notified of the then current address of such holder, at which time or as soon as reasonably practicable thereafter, such distribution will be made to such holder without interest; provided, however, that, such undeliverable distributions will be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of 90 days after the date of distribution in accordance with the section on Unclaimed

38

Distributions below. The Disbursing Agent will have no obligation to attempt to locate any holder of an Allowed Claim other than by reviewing the Schedules and its books and records (including any proofs of claim filed against the Debtor).

(d)      *Delivery of Distributions to Holders of Notes, Bonds, Unsecured Notes and Unsecured Bonds*. On the Effective Date, or as soon thereafter as is practicable, the distributions to be made under the Plan to holders of Class 2 Claims shall be made to J.P. Morgan, and the distributions to holders of Class 4 Claims on account of the Unsecured Notes and the Unsecured Bonds shall be made to the respective Indenture Trustee under the Unsecured Indentures. None of the Indenture Trustees shall be required to give any bond or surety or other security for the performance of their duties. Notwithstanding the foregoing, distributions to holders of Class 2 Claims shall be made by J.P. Morgan in accordance with the Secured Indentures, and distributions to holders of the Unsecured Notes and Unsecured Bonds shall be made by the respective Indenture Trustee under the Unsecured Indentures, subject in each instance to the rights of the Indenture Trustees under the applicable Secured Indentures or the Unsecured Indentures, as the case may be, including, without limitation, their right to assert charging liens against such distributions.

(e)      *Distributions of Cash*. At the option of the Disbursing Agent, any Cash payment to be made hereunder may be made by check or wire transfer or as otherwise required or provided in applicable agreements.

(f)      *Compromise of Controversies*. Pursuant to Bankruptcy Rule 9019, and in consideration for the classification, distribution and other benefits provided under the Plan, the provisions of this Plan shall constitute a good faith compromise and settlement of all Claims and controversies resolved pursuant to the Plan, including, without limitation, all Claims arising prior to the Commencement Date, whether known or unknown, foreseen or unforeseen, asserted or unasserted, arising out of, relating to or in connection with the business or affairs of or transactions with the Debtor. The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of each of the foregoing compromises or settlements and all other compromises and settlements provided for in the Plan, and the Bankruptcy Court's findings shall constitute its determination that such compromises and settlements are in the best interests of the Debtor, the Estate, creditors and other parties-in-interest, and are fair, equitable and within the range of reasonableness. Notwithstanding the foregoing, settlement by the Debtor of Insurance Claims pursuant to Bankruptcy Rule 9019 or under the provisions of the Plan shall not:

(1)      be binding upon the Insurers,

(2)      be considered a settlement of or judgment under the provisions of the Insurance Policies,

(3)      accelerate any obligations of the Insurers under the Insurance Policies, nor

(4)      be admissible in any court or proceeding as to the amount of any Insurance Claim.

(g)      *Minimum Distributions*. No payment of Cash less than $10 shall be made by the Disbursing Agent. Any Assets of the Estate that are undistributable in accordance with this Section 5.5 shall be distributed to a charitable organization exempt from federal income tax under section 501(c)(3) of the Tax Code to be selected by, and unrelated to, the Debtors as contemplated by Section 6.2 hereof.

(h)    *Date of Distributions*.  Unless otherwise expressly provided herein, any distributions or deliveries to be made under the Plan shall be made on the Effective Date, or as soon thereafter as is reasonably practicable.  In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on or as soon as reasonably practicable after the next succeeding Business Day, but shall be deemed to have been completed as of the required date.

4.    Closing of the Chapter 11 Case

If at any time the Authorized Agent determines that the expense of administering the Debtor so as to make a final distribution to Allowed Claims is likely to exceed the value of the assets remaining in the estate, the Authorized Agent shall apply to the Bankruptcy Court for authority to (i) reserve any amounts necessary to close the Chapter 11 Case, (ii) donate any balance to a charitable organization exempt from federal income tax under section 501(c)(3) of the Tax Code that is unrelated to Weirton and any insider of Weirton, and (iii) close the Chapter 11 Case in accordance with the Bankruptcy Code and Bankruptcy Rules.  If the aims or purposes of any charities satisfying the conditions of clause (ii) above relate to benefiting the residents of Weirton, West Virginia, then the Authorized Agent shall choose any recipients of any donations from among such charities. Notice of such application shall be given electronically, to the extent practicable, to those parties who have filed requests for notices and whose electronic addresses remain current and operating.

**I.    Treatment of Disputed, Contingent and Unliquidated Claims**

1.    Disputed Claims

(a)    *No Distribution Pending Allowance of Claims*.  Notwithstanding any other provision hereof, if any portion of a Claim is a Disputed Claim, no payment or distribution provided hereunder shall be made on account of such Claim unless and until such Disputed Claim becomes an Allowed Claim.

(b)    *Distributions as to Allowed Portion of Disputed Claims*.  The holder of a Disputed Claim that becomes, in part, an Allowed Claim, will receive a distribution in respect of the Allowed portion of such Claim, in accordance with Article IV of the Plan for Claims partially Allowed on or prior to the Effective Date, and Section 5.3(B) of the Plan for Claims partially Allowed subsequent to the Effective Date.

(c)    *Distributions Upon Allowance of Disputed Claims*.  If, on or after the Effective Date, any Disputed Claim becomes, in whole or in part, an Allowed Claim, the Debtor shall, no later than the fifteenth (15th) Business Day of the first month following the month in which the Disputed Claim becomes an Allowed Claim, distribute to the holder thereof the distributions, if any, that such holder would have received had its Claim been Allowed on the Effective Date, except as otherwise provided herein.

(d)    *Distributions to Holders of Allowed Claims Upon Disallowance of Disputed Claims*.  Subject to the Debtor's rights under Section 6.2 of the Plan, upon disallowance of any Disputed Claim, each holder of an Allowed Claim in the same Class as the disallowed Disputed Claim will be entitled to its Pro Rata Share of Cash equal to the distribution that would have been made in accordance with Article IV of the Plan to the holder of such Disputed Claim had such Disputed Claim been an Allowed Claim on or prior to the Effective Date.  Such distributions on account of disallowed Disputed Claims will be made as soon as practicable after the fifteenth business day following allowance

40

or disallowance of the last Disputed Claim. Upon allowance or disallowance of all or any portion of such Disputed Claims, Weirton will make appropriate distributions in accordance with the Plan.

2. Objections to and Resolution of Claims

(a) *Procedures*. Unless otherwise ordered by the Bankruptcy Court after notice and a hearing, following the Effective Date, the Debtor shall have the right to the exclusion of all others (except as to applications for allowances of compensation and reimbursement of expenses under sections 330 and 503 of the Bankruptcy Code) to make and file objections to Claims and shall serve a copy of each objection upon the holder of the Claim to which the objection is made as soon as practicable, but in no event later than sixty (60) days after the Effective Date. From and after the Confirmation Date, all objections shall be litigated to a Final Order except to the extent the Debtor elects to withdraw any such objection or the Debtor and the holder of a Claim elect to compromise, settle, or otherwise resolve any such objection, in which event they may settle, compromise, or otherwise resolve any Disputed Claim, subject to the approval of the Bankruptcy Court. Notwithstanding any authority to the contrary, an objection to a Claim shall be deemed properly served on the claimant if the Debtor effects service in any of the following manners: (a) in accordance with Federal Rule of Civil Procedure 4, as modified and made applicable by Bankruptcy Rule 7004; (b) to the extent counsel for a claimant is unknown, by first class mail, postage prepaid, on the signatory on the proof of claim or other representative identified in the proof of claim or any attachment thereto; or (c) by first class mail, postage prepaid, on any counsel that has appeared on the claimant's behalf in the Chapter 11 Case.

(b) *No Recourse*. Notwithstanding that the allowed amount of any particular Disputed Claim is reconsidered under the applicable provisions of the Bankruptcy Code and Bankruptcy Rules or is allowed in an amount for which after application of the payment priorities established by this Plan there is insufficient value to provide a recovery equal to that received by other holders of Allowed Claims in the respective Class, no Claim holder shall have recourse against the Disbursing Agent, the Debtor or any of its respective professional consultants, agents, attorneys, advisors, officers, directors or members or its successors or assigns, or any of its respective property. However, nothing in the Plan shall modify any right of a holder of a Claim under section 502(j) of the Bankruptcy Code.

**J. The Creditors' Committee and the Retiree Committee**

The Creditors' Committee and the Retirees' Committee will continue in their current forms from and after the Confirmation Date until the Effective Date, and will have all of the rights, powers and duties set forth in the Bankruptcy Code. Except as otherwise specifically provided under the Plan, on the Effective Date, the Creditors' Committee and the Retirees' Committee will be dissolved and disbanded.

**K. Vesting of Property and Discharge of Claims**

1. Vesting of Property

On the Effective Date, all property of the Estate shall be vested in the Liquidating Trust, free and clear of any and all Liens, Claims, encumbrances or restrictions unless otherwise specifically provided in the Plan.

2. Discharge of Claims and Debts and Termination of Equity Interests

Except as otherwise specifically provided herein or in the Confirmation Order, the rights afforded in the Plan and the payments and distributions to be made hereunder shall discharge all existing debts and

41

Claims, and terminate all Equity Interests of any kind, nature or description whatsoever against or in the Debtor's Estate or any of its assets or properties to the fullest extent permitted by section 1141 of the Bankruptcy Code. Except as otherwise provided herein or in the Confirmation Order, upon the Effective Date, all existing Claims against the Debtor's Estate and Equity Interests in the Debtor, shall be, and shall be deemed to be, discharged and terminated, and all holders of Claims and Equity Interests shall be precluded and enjoined from asserting against the Debtor's Estate, or any of its assets or properties, any other or further Claim or Equity Interest based upon any act or omission, transaction or other activity of any kind or nature that occurred prior to the Effective Date, whether or not such holder has filed a proof of Claim or proof of Equity Interest. It is the EPA's position that the debtor is not entitled to a discharge.

### L. Exculpation

Neither the Debtor, the Creditors' Committee, the Informal Committee, the Retirees' Committee, J.P. Morgan, the Indenture Trustees under the Unsecured Indentures nor any of their respective members, officers, directors, employees, advisors, professionals or agents, (collectively, "Exculpation Parties") shall have or incur any liability to any holder of a Claim or Equity Interest for any act or omission in connection with, related to, or arising out of the Chapter 11 Case, negotiations regarding or concerning the Plan, the pursuit of confirmation of the Plan, the consummation of the Plan, or the administration of the Plan or the property to be distributed under the Plan, except for willful misconduct or gross negligence, and, in all respects, the Exculpation Parties shall be entitled to rely upon the advice of counsel with respect to their duties and responsibilities under the Plan.

### M. Executory Contracts

On the Effective Date, all executory contracts and unexpired leases to which the Debtor is then a party shall be deemed rejected as of the Effective Date, except for an executory contract or unexpired lease that (i) has been assumed or rejected pursuant to Final Order of the Bankruptcy Court entered prior to the Effective Date or (ii) is the subject of a separate motion to assume or reject filed under section 365 of the Bankruptcy Code by the Debtor prior to the Effective Date.

In connection with the Sale Transaction, the Debtor assumed and assigned to the Buyer a substantial number of executory contracts and unexpired leases. Further, on May 18, 2004, the Debtor filed a motion for authority to reject, effective as of May 17, 2004, all executory contracts and unexpired leases to which it was then a party and that were not to be assigned to the Buyer as part of the Sale Transaction. By Order dated June 2, 2004 ("Contract Rejection Order"), the Bankruptcy Court approved the Debtors' rejection of all executory contracts and unexpired leases (with the exception of the Insurance Policies and three agreements that were preserved during the transition of operations from Weirton to the Buyer) that were not (i) assigned to the Buyer in connection with the Sale Transaction, (ii) subject to an assignment motion, or (iii) Insurance Policies.

Insurance Policies. The Debtor's current year Insurance Policies and any agreements, documents or instruments relating thereto, are postpetition contracts and shall continue to operate unaffected by the Plan, with the Insurers responsible for claims in accordance with the terms and provisions of such Insurance Policies. The Debtor's Insurance Policies that have expired as of the Confirmation Date (whether entered into prior or subsequent to the Commencement Date) are not executory contracts subject to assumption or rejection. The Insurers shall be responsible for continuing coverage obligations under such Insurance Policies.

Nothing contained in the Plan shall constitute or be deemed to be a waiver of any cause of action that the Debtor may hold against any entity, including, without limitation, any Insurer under any of the

Debtor's Insurance Policies.

Approval of Assumption or Rejection of Executory Contracts and Unexpired Leases. Entry of the Confirmation Order shall constitute the approval, pursuant to section 365(a) of the Bankruptcy Code, of the rejection of the executory contracts and unexpired leases rejected as of the Effective Date pursuant to the Plan.

Bar Date for Filing Proofs of Claim Relating to Executory Contracts and Unexpired Leases Rejected by Operation of the Plan. In the event that the rejection of an executory contract or unexpired lease by the Debtor pursuant to the Plan results in damages to the other party or parties to such contract or lease, a Claim for such damages, if not heretofore evidenced by a filed proof of claim, shall be forever barred and shall not be enforceable against the Debtor or any property to be distributed under the Plan unless a proof of claim is filed with the Bankruptcy Court and served upon the Debtor on or before the date that is thirty (30) days after the Confirmation Date.

### N.     Retention of Jurisdiction of the Bankruptcy Court

The Bankruptcy Court shall retain jurisdiction of all matters arising under, arising out of, or related to the Chapter 11 Case and the Plan pursuant to, and for the purposes of, sections 105(a) and 1142 of the Bankruptcy Code and for, among other things, the following purposes: (a)to hear and determine motions for the assumption, assumption and assignment, or rejection of executory contracts or unexpired leases and the allowance of Claims resulting therefrom; (b) to determine any motion, adversary proceeding, application, contested matter, and other litigated matter pending on or commenced after the Confirmation Date, including, without limitation, any proceeding to recover a Cause of Action or Avoidance Action; (c) to ensure that distributions to holders of Allowed Claims are accomplished as provided herein; (d) to consider Claims or the allowance, classification, priority, compromise, estimation, or payment of any Claim; (e) to enter, implement, or enforce such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, reversed, revoked, modified, or vacated; (f) to issue injunctions, enter and implement other orders, and take such other actions as may be necessary or appropriate to restrain interference by any person with the consummation, implementation, or enforcement of the Plan, the Confirmation Order, or any other order of the Bankruptcy Court; (g) To hear and determine any issue or dispute arising under or related to the ISG Agreement; provided, however, such issue or dispute involves the Debtors; (h) to hear and determine any application to modify the Plan in accordance with section 1127 of the Bankruptcy Code, to remedy any defect or omission or reconcile any inconsistency in the Plan, the Disclosure Statement, or any order of the Bankruptcy Court, including the Confirmation Order, in such a manner as may be necessary to carry out the  purposes and effects thereof;  (i) to hear and determine all applications under sections 330, 331, and 503(b) of the Bankruptcy Code for awards of compensation for services rendered and reimbursement of expenses incurred prior to the Confirmation Date; (j) to hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Plan, the Confirmation Order, any transactions or payments contemplated hereby, or any agreement, instrument, or other document governing or relating to any of the foregoing; (k) to take any action and issue such orders as may be necessary to construe, enforce, implement, execute, and consummate the Plan or to maintain the integrity of the Plan following consummation; (l) to recover all assets of the Debtor, property of the Estate, wherever located; (m) to determine such other matters and for such other purposes as may be provided in the Confirmation Order; (n) to hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code (including, without limitation, matters with respect to any taxes payable by a trust or reserve established in furtherance of the Plan); (o) to hear and determine any other matters related hereto and not inconsistent with the Bankruptcy Code and title 28 of the United States Code; and (p) to enter a final decree closing the Chapter 11 Case

**O.** **Conditions to Effectiveness of the Plan**

1. Conditions

The following conditions must occur and be satisfied (either previously or concurrently) for the Plan to become effective:

(a) No stay of the Confirmation Order shall then be in effect;

(b) The Debtor shall have sufficient Cash to pay the sum of (i) Allowed Administrative Expense Claims, Allowed Priority Tax Claims, Allowed Other Secured Claims, and Allowed Priority Non-Tax Claims, and the Debtor's professional fees that have not been paid, (ii) an amount that would be required to distribute to the holders of Disputed Administrative Expense Claims, Disputed Priority Tax Claims, Disputed Other Secured Claims, and Disputed Priority Non-Tax Claims if all such Claims are subsequently Allowed, as set forth more fully in Section VII hereof, and (iii) an amount that would be required to satisfy all the Debtor's costs and expenses in connection with the Debtor's obligations under the Plan; and

(c) Substantial Consummation will or is likely to occur on or before September 30, 2004, or J.P. Morgan, the Informal Committee and its members waive the requirement of Section 6(c) of Settlement and Lockup Agreement.

**P.** **Releases**

**In consideration of the efforts expended and to be expended by the Debtor's Authorized Agent, former officers and directors and management employees in conjunction with their operational and financial restructuring during the Chapter 11 Case, on the Effective Date, the Debtor will automatically release and will be deemed to release any and all claims (including any claims arising out of any alleged fiduciary or other duty) that it has or may have against the Authorized Agent and any of its officers and directors who held such positions after the Commencement Date in their capacities as such, arising or based upon any actions, conduct or omissions occurring after the Commencement Date and prior to the Effective Date, excluding willful misconduct and gross negligence. The Confirmation Order shall constitute an order approving the compromise, settlement and release of any and all such claims pursuant to section 1123(b)(3)(A) of the Bankruptcy Code.**

**The Plan shall not be construed as discharging, releasing, or relieving the Debtor, or any other party, in any capacity, from any liability with respect to the Pension Plan under any law or regulatory provision relating the Pension Plan. The PBGC and Pension Plan shall not be enjoined or precluded from enforcing such liability as a result of the Plan's provisions or confirmation.**

*Each holder of a Claim (whether or not Allowed) against or Equity Interest in the Debtor that votes to accept the Plan shall be enjoined from commencing or continuing any action, employment of process or act to collect, offset or recover and shall be deemed to release any Claim that arose against the Authorized Agent or such officers, directors or management employees prior to the Effective Date, excluding, however, willful misconduct and gross negligence.*

Case 5:03-bk-01802    Doc 2594    Filed 07/09/04    Entered 07/09/04 17:27:15    Desc
Main Document    Page 50 of 61

**Q.      Release of Other Third Parties**

The Debtor has released J.P. Morgan, the Informal Committee, its members and each of their respective present or former directors, officers, employees, attorneys, accountants, investment bankers, financial advisors and agents pursuant to the Settlement and Lockup Agreement, which Settlement and Lockup Agreement is attached to the Plan as <u>Exhibit 1</u> and incorporated therein.  Upon the Effective Date, and conditioned upon the acceptance of the Plan by Class 2, such releases shall be extended to cover the period from the approval of the Settlement and Lockup Agreement through the Effective Date.

**R.      Other Miscellaneous Provisions**

**1.      Compliance with Tax Requirements on Distributions**

In connection with all distributions to be made to the holders of Allowed Claims and Allowed Equity Interests under the Plan, the Debtor and its agents will comply with all withholding and reporting requirements imposed by federal, state and local taxing authorities and all such distributions under the Plan will be subject to such withholding and reporting requirements.

**2.      Amendment and Modification of the Plan**

The Plan may be amended, modified, or supplemented by the Debtor in the manner provided for by section 1127 of the Bankruptcy Code or as otherwise permitted by law without additional disclosure pursuant to section 1125 of the Bankruptcy Code, except as the Bankruptcy Court may otherwise direct. In addition, after the Confirmation Date, so long as such action does not materially adversely affect the treatment of holders of Claims or Equity Interests under the Plan, the Debtor may institute proceedings in the Bankruptcy Court to remedy any defect or omission or reconcile any inconsistencies in the Plan or the Confirmation Order, with respect to such matters as may be necessary to carry out the purposes and effects of the Plan. Prior to the Effective Date, the Debtor may make appropriate technical adjustments and modifications to the Plan without further order or approval of the Bankruptcy Court, *provided* that such technical adjustments and modifications do not adversely affect in a material way the treatment of holders of Claims or Equity Interests.

**3.      Revocation and Withdrawal of Plan**

The Debtor reserves the right to revoke or withdraw the Plan at any time prior to the Confirmation Date. If the Debtor takes such action, the Plan shall be deemed null and void. In such event, nothing contained herein shall be deemed to constitute a waiver or release of any Claim by or against the Debtor or any other person or to prejudice in any manner the rights of the Debtor or any other person in any further proceedings involving the Debtor.

**4.      Authority of Holder of Allowed Claims**

Each and every holder of an Allowed Claim that elects to participate in distributions provided for under the Plan represents and warrants to the Debtor and Weirton that such holder is authorized to accept, in consideration of such Allowed Claim, the distributions provided for under the Plan, and that there are no outstanding commitments, agreements or understandings, express or implied, that may or will in any way defeat or modify the rights conveyed or released or obligations undertaken under the Plan.

45

5. <u>Cram-Down Reservation</u>

**If any impaired class votes to accept the Plan by the requisite statutory majorities provided in sections 1126(c) and 1126(d) of the Bankruptcy Code, as applicable, or if any impaired class is deemed to have rejected the Plan, the Debtor reserves the right to undertake to have the Bankruptcy Court confirm the Plan under section 1129(c) of the Bankruptcy Code and/or amend the Plan in accordance with Section 13.10 hereof to the extent necessary to obtain entry of a confirmation order.**

## VII. PROJECTED DISTRIBUTION TO CREDITORS

The Debtor and its professionals have conducted an analysis of all claims scheduled by the Debtor. The estimated Allowed Claims and Allowed Interests and projected distribution set forth in the table in Section II above represent the best estimates of the Debtor and its professionals as to the estimated allowed amounts of the various claims, based upon the information available to them as of the date hereof. The Debtor has prepared a good faith estimate based on these varying sources of information and there have been more than $2.2 billion in claims filed against the Debtor. The Debtor has estimated administrative, secured, priority unsecured and unsecured claims based on a variety of information sources including its books and records, schedules and statements, reports prepared by Weirton's claims agent regarding claims filed with the Court, reports prepared by Weirton to estimate various claims, actual claims filed with the Court and discussions with its outside advisors.

SUBSTANTIAL EFFORT HAS BEEN MADE TO ENSURE THE ACCURACY OF THE ESTIMATED INFORMATION SUMMARIZED IN THE TABLE IN SECTION II HEREOF. ANTICIPATED ALLOWED AMOUNTS OF ALLOWED CLAIMS AND ALLOWED INTERESTS AND THE PROJECTED DISTRIBUTIONS SUMMARIZED IN THE TABLE IN SECTION II HEREOF ARE SUBJECT, HOWEVER, TO THE UNCERTAINTIES OF LITIGATION THAT MAY OCCUR WITH RESPECT TO CERTAIN CLAIMS AND OTHER FACTORS THAT MAY OR MAY NOT BE RESOLVED IN THE DEBTOR'S FAVOR. THEREFORE, NO ASSURANCES CAN BE GIVEN THAT THE ESTIMATED AMOUNTS OF ALLOWED CLAIMS AND ALLOWED INTERESTS AND THE PROJECTED DISTRIBUTION WILL BE ACHIEVED.

## VIII. UNITED STATES FEDERAL INCOME TAX CONSIDERATIONS

### A. Introduction

The following discussion summarizes certain material United States federal income tax ("Federal Income Tax") consequences of the Plan to certain holders of Allowed Claims (the "Creditors") and the Debtor. This discussion does not address the Federal Income Tax consequences to: (i) Creditors whose claims are entitled to payment in full in cash, or are otherwise unimpaired under the Plan; and (ii) holders of equity interests or claims that are extinguished without a distribution. This discussion is based upon existing provisions of the Tax Code, Treasury regulations promulgated thereunder, judicial authorities and current administrative rulings and practices now in effect. No assurance can be given that future legislation, regulations, administrative pronouncements and/or judicial decisions will not change applicable law and affect the analysis described herein. Any such change could be applied retroactively in a manner that would adversely affect the creditors and the Debtor.

The Federal Income Tax consequences of certain aspects of the Plan are uncertain due to the lack of applicable legal authority and may be subject to administrative or judicial interpretations that differ from the discussion below. Counsel for the Debtor has not sought and will not seek any rulings from the

46

Internal Revenue Service ("IRS") with respect to the Federal Income Tax consequences discussed below. Although the discussion below represents the best judgment as to the matters discussed herein, it does not in any way bind the IRS or the courts or in any way constitute an assurance that the Federal Income Tax consequences discussed herein will be accepted by the IRS or the courts.

The following discussion does not address state, local or foreign tax considerations that may be applicable to the Debtor or creditors and the discussion does not address the tax consequences of the Plan to certain types of creditors (including foreign persons, financial institutions, life insurance companies, tax-exempt organizations and taxpayers who may be subject to the alternative minimum tax) who may be subject to special rules not addressed herein.

THE FOLLOWING SUMMARY OF CERTAIN MATERIAL FEDERAL INCOME TAX CONSEQUENCES IS FOR GENERAL INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES PERTAINING TO A HOLDER OF AN ALLOWED CLAIM OR EQUITY INTEREST. THE DEBTOR IS NOT MAKING ANY REPRESENTATIONS REGARDING THE PARTICULAR TAX CONSEQUENCES OF CONFIRMATION AND CONSUMMATION OF THE PLAN WITH RESPECT TO THE DEBTOR OR THE HOLDERS OF ANY CLAIMS OR EQUITY INTERESTS, NOR IS THE DEBTOR RENDERING ANY FORM OF LEGAL OPINION OR TAX ADVICE ON SUCH TAX CONSEQUENCES. ALL HOLDERS OF CLAIMS OR EQUITY INTERESTS ARE ADVISED TO CONSULT THEIR OWN TAX ADVISORS WITH RESPECT TO THE FEDERAL, STATE, LOCAL, FOREIGN AND OTHER TAX CONSEQUENCES OF THE IMPLEMENTATION OF THE PLAN IN GENERAL AND IN PARTICULAR, THE TIMING, CHARACTER AND AMOUNTS OF INCOME, GAIN, LOSS, DEDUCTION, CREDIT OR CREDIT RECAPTURE TO BE RECOGNIZED, AND ANY PROCEDURAL REQUIREMENTS WITH WHICH THE HOLDER MUST COMPLY.

**B.      Certain Material United States Federal Income Tax Consequences to the Debtors**

The Debtors do not believe that there will be any material current cash United States federal income tax consequences to the Debtors as a result of the implementation of the Plan.

**C.      Certain Material United States Federal Income Tax Consequences to Holders of Claims**

1.      **General**

The tax treatment of holders of claims and the character and amount of income, gain or loss recognized as a consequence of the Plan and the distributions provided for by the Plan will depend upon, among other things, (i) whether the Claim (or any portion thereof) constitutes a Claim for principal or interest; (ii) the type and classification of consideration received by the holder in exchange for the Claim; (iii) whether the holder is a resident of the United States for tax purposes (or falls into any special class of taxpayers, such as those that are excluded from this discussion as noted above); (iv) the manner in which a holder acquired a Claim; (v) the length of time the Claim has been held; (vi) whether the claim was acquired at a discount; (vii) whether the holder has taken a bad debt deduction with respect to the Claim (or any portion thereof) in the current or prior years; (viii) whether the holder has previously included accrued but unpaid interest with respect to the Claim; (ix) the method of tax accounting of the holder; (x) whether the claim is an installment obligation for United States federal income tax purposes; and (xi) whether the "market discount" rules are applicable to the holder. Therefore, holders of Claims should consult their tax advisors for information that may be relevant to their particular situation and

47

circumstances and the particular tax consequences to them of the transactions contemplated by the Plan.

A holder of a Claim should generally recognize a gain (or loss) to the extent that the amount realized under the Plan in respect of the Claim exceeds (or is exceeded by) the holder's tax basis in the Claim. The holder's amount realized for this purpose will generally equal the amount of Cash the holder receives under the Plan in respect of its Claim. The timing and amount of income, gain or loss recognized as a consequence provided for by the Plan will depend on, among other things, whether the holder of a Claim receives multiple distributions pursuant to the Plan and whether the Debtor's obligation to make such payments is treated as a new debt for United States federal income tax purposes. Gain or loss may not currently be recognized if the property received does not have an ascertainable fair market value.

2.     **Market Discount**

The market discount provisions of the Code may apply to holders of certain Claims. In general, a debt obligation other than a debt obligation with a fixed maturity of one year or less that is acquired by a holder in the secondary market (or, in certain circumstances, upon original issuance) is a "market discount bond" as to that holder if its stated redemption price at maturity (or, in the case of a debt obligation having original issue discount, its revised issue price) exceeds the tax basis of the debt obligation will not be a "market discount bond" if such excess is less than a statutory *de minimis* amount. Gain recognized by the holder of a Claim with respect to a "market discount bond" will generally be treated as ordinary interest income to the extent of the market discount accrued on such bond during the holder's grace period of ownership, unless the holder elected to include accrued market discount in taxable income currently. A holder of a market discount bond that is required under the market discount rules of the Code to defer deduction of all or a portion of the interest on indebtedness incurred or maintained to acquire or carry the bond may be allowed to deduct such interest, in whole or in part, on disposition of such bond.

3.     **Information Reporting and Backup Withholding**

Certain payments, including the payments with respect to Claims pursuant to the Plan, are generally subject to information reporting by the payor (the Debtor) to the IRS. Moreover, such reportable payments are subject to backup withholding under certain circumstances. Under the Code's backup withholding rules, a holder of a Claim may be subject to backup withholding with respect to distributions or payments made pursuant to the Plan, unless the holder: (1) comes within certain exempt categories (which generally include corporations) and, when required, demonstrates this fact, or (2) provides a correct United States taxpayer identification number and certifies under penalty of perjury that the taxpayer identification number is correct and that the taxpayer is not subject to backup withholding because of a failure to report all dividend and interest income.

Holders of Claims that are non-United States Persons and that receive payments or distributions under the Plan will not be subject to backup withholding, provided that such holders furnish certification of their status as non-United States Persons (and furnish any other required certification), or are otherwise exempt from backup withholding. Generally, such certification is provided on IRS Form W-8BEN.

Backup withholding is not an additional tax. Amounts withheld under the backup withholding rules may be credited against a holder's United States federal income tax liability and a holder may obtain a refund of any excess amounts withheld under the backup withholding rules by filing an appropriate claim for refund with the IRS (generally, a United States federal income tax return).

PERSONS CONCERNED WITH THE TAX CONSEQUENCES OF THE PLAN SHOULD

CONSULT THEIR OWN ACCOUNTANTS, ATTORNEYS AND/OR ADVISORS. THE DEBTOR MAKES THE ABOVE-NOTED DISCLOSURE OF POSSIBLE TAX CONSEQUENCES FOR THE SOLE PURPOSE OF ALERTING READERS TO TAX ISSUES THEY MAY WISH TO CONSIDER.

## IX.    ALTERNATIVES TO THE PLAN

The Debtor has determined that the Plan is the best means of providing maximum recoveries to creditors. Alternatives to the Plan that have been considered and evaluated by the Debtor during the course of the Chapter 11 Case include (i) liquidation of the Debtor's assets under chapter 7 of the Bankruptcy Code, and (ii) an alternative chapter 11 plan. The Debtor's thorough consideration of these alternatives to the Plan has led it to conclude that the Plan, in comparison, provides a greater recovery to creditors on a more expeditious timetable and in a manner which minimizes inherent risks in any other course of action available to the Debtor.

### A.    Other Plans of Reorganization

If the Plan is not confirmed, the Debtor or any other party in interest (if the Debtor's exclusive period in which to file a chapter 11 plan has expired) could attempt to formulate an alternative chapter 11 plan that might provide for the liquidation of the Debtor's assets other than as provided in the Plan. However, since substantially all of the Debtor's assets have already been sold to the Buyer, the Debtor believes that any alternative chapter 11 plan will necessarily be substantially similar to the Plan. Any attempt to formulate an alternative chapter 11 plan would necessarily delay creditors' receipt of distributions yet to be made. Accordingly, the Debtor believes that the Plan will enable all creditors entitled to distributions to realize the greatest possible recovery on their respective Claims with the least possible delay.

### B.    Liquidation Under Chapter 7 of the Bankruptcy Code

If the Plan or any other chapter 11 plan for the Debtor cannot be confirmed under section 1129(a) of the Bankruptcy Code, the Chapter 11 Case may be converted to cases under chapter 7 of the Bankruptcy Code, in which event a trustee would be elected or appointed to liquidate any remaining assets of the Debtor for distribution to creditors pursuant to chapter 7 of the Bankruptcy Code. If a trustee is appointed and the remaining assets of the Debtor are liquidated under chapter 7 of the Bankruptcy Code, all creditors holding Allowed Administrative Expense Claims, Allowed Priority Tax Claims, and Allowed Priority Non-Tax Claims may receive distributions of a lesser value on account of their Allowed Claims and likely would have to wait a longer period of time to receive such distributions than they would under the Plan. A chapter 7 trustee, who would lack the Debtor's knowledge of their affairs, would be required to invest substantial time and resources to investigate the facts underlying the multitude of Claims filed against the Estates.

## X.    CONFIRMATION REQUIREMENTS

### A.    The Confirmation Hearing

The Bankruptcy Code requires the Bankruptcy Court, after notice, to hold a confirmation hearing before a plan of reorganization may be confirmed. The Confirmation Hearing to confirm the Plan has been scheduled for the date set forth in the attached notice of confirmation hearing before the Honorable L. Edward Friend, II, United States Bankruptcy Judge in the Bankruptcy Courtroom, Third Floor, United States Federal Building & Courthouse, 12th and Chapline Streets, Wheeling, West Virginia  26003. The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further

\\Oase 5:03-bk-01802    Doc 2594    Filed 07/09/04    Entered 07/09/04 17:27:15    Desc
Main Document      Page 55 of 61

notice except for an announcement of the adjourned date made at the Confirmation Hearing. Any objection to confirmation must be made in writing and specify in detail the name and address of the objector, all grounds for the objection and the amount of the claim or number and type of shares of equity security interests held by the objector. Any such objection must be filed with the Bankruptcy Court and served so that it is received by the Bankruptcy Court and certain other parties when and as set forth in the attached notice of confirmation hearing.

Objections to confirmation of the Plan are governed by Bankruptcy Rule 9014. At the hearing on the confirmation of the Plan, the Bankruptcy Court will confirm the Plan only if the requirements of the Bankruptcy Code, particularly those set forth in section 1129 of the Bankruptcy Code, have been satisfied.

### B.    Acceptances Necessary to Confirm the Plan

At the Confirmation Hearing, the Bankruptcy Court must determine, among other things, whether the Plan has been accepted by the requisite amount and number of Allowed Claims and Allowed Interests in each impaired class. Under the Bankruptcy Code, a class of creditors or equity security holders is impaired if its legal, equitable or contractual rights are altered by a proposed plan of reorganization. If a class is not impaired, each creditor or equity security holder in such unimpaired class is conclusively presumed to have accepted the plan pursuant to section 1126(f) of the Bankruptcy Code. Classes 1, 2, 3 and 4 are not impaired under the Plan and are, therefore, not entitled to vote on the Plan. Classes 5, 6 and 7 are impaired under the Plan and holders of Allowed Claims or Allowed Interests in such classes are entitled to vote for or against the Plan by completing and returning ballots mailed to them with this Disclosure Statement in the manner set forth in the ballots. Classes 5 is impaired under the Plan, but is deemed to reject the Plan, and is not entitled to vote.

An impaired class of creditors and each holder of a claim in such class will be deemed to have accepted the Plan if the holders of at least two-thirds in amount and more than one-half of those in number of the Allowed Claims in such impaired class for which complete and timely ballots have been received have voted for acceptance of the Plan. An impaired class of equity securities and each holder of an interest in such class will be deemed to have accepted a plan if the plan has been accepted by at least two-thirds in amount of the interests in such class who actually vote on the Plan.

Because the equity interests held by the members of Class 5 is entirely eliminated under the Plan, Class 5 is deemed to have rejected the Plan, and the Debtor cannot satisfy the requirements of section 1129(a)(8) of the Bankruptcy Code. Accordingly, the Debtor intends to seek confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code. Under section 1129(b), the Bankruptcy Court must determine, among other things, that the Plan does not discriminate unfairly and that it is fair and equitable with respect to each class of impaired Allowed Claims and Allowed Interests that have not voted to accept the Plan.

### C.    Best Interests of Creditors

The Bankruptcy Code requires that each holder of an impaired claim or equity interest either (i) accept the Plan, or (ii) receive or retain under the Plan property of a value, as of the Effective Date, that is not less than the value such holder would receive if the Debtor was liquidated under chapter 7 of the Bankruptcy Code.

The first step in determining whether this test has been satisfied is to determine the dollar amount that would be generated from the liquidation of the Debtor's assets and properties in the context of a

chapter 7 liquidation case. The gross amount of cash that would be available for satisfaction of claims and equity interests would be the sum consisting of the proceeds resulting from the disposition of the unencumbered assets and properties of the Debtor, augmented by the unencumbered cash hold by the Debtor at the time of the commencement of the liquidation case.

The next step is to reduce that gross amount by the costs and expenses of liquidation and by such additional administrative and priority claims that might result from the use of chapter 7 for the purposes of liquidation. Any remaining net cash would be allocated to creditors and shareholders in strict priority in accordance with section 726 of the Bankruptcy Code. Finally, the present value of such allocations (taking into account the time necessary to accomplish the liquidation) are compared to the value of the property that is proposed to be distributed under the Plan on the Effective Date.

The Debtor's costs of liquidation under chapter 7 would include the fees payable to a trustee in bankruptcy, as well as those fees that might be payable to attorneys and other professionals that such a trustee might engage. Other liquidation costs include the expenses incurred during the Chapter 11 Case allowed in the chapter 7 cases, such as compensation for attorneys, financial advisors, appraisers, accountants, and other professionals for the Debtor, the Creditors' Committee and the Retirees' Committee, and costs and expenses of members of the Creditors' Committee, as well as other compensation claims.

The foregoing types of claims, costs, expenses, fees, and such other claims that may arise in a liquidation case would be paid in full from the liquidation proceeds before the balance of those proceeds would be made available to pay prepetition priority and unsecured Claims.

The Debtor submits that each impaired Class will receive under the Plan a recovery at least equal in value to the recovery such Class would receive pursuant to a liquidation of the Debtor under chapter 7 of the Bankruptcy Code.

After consideration of the effects that a chapter 7 liquidation would have on the ultimate proceeds available for distribution to creditors in the Chapter 11 Case, including (i) the increased costs and expenses of a liquidation under chapter 7 arising from fees payable to a trustee in bankruptcy and professional advisors to such trustee, and (ii) the substantial increases in claims that would be satisfied on a priority basis, the Debtor has determined that confirmation of the Plan will provide each holder of an Allowed Claim with a recovery that is not less than such holder would receive pursuant to liquidation of the Debtor under chapter 7.

The Debtor also believes that the value of any distributions to each Class of Allowed Claims in a chapter 7 case, including all Other Secured Claims, would be less than the value of distributions under the Plan because such distributions in a chapter 7 case would not occur for a substantial period of time. In the event litigation was necessary to resolve claims asserted in a chapter 7 case, the delay could be prolonged and administrative expenses increased.

D.     Feasibility

Section 1129(a)(11) of the Bankruptcy Code provides that a chapter 11 plan may be confirmed only if the Court finds that such plan is feasible. A feasible plan is one which will not lead to a need for further reorganization or liquidation of the debtor. Since the Plan provides for the liquidation of the Debtor, the Court will find that the Plan is feasible if it determines that the Debtor will be able to satisfy the conditions precedent to the Effective Date and otherwise have sufficient funds to meet its post-Confirmation Date obligations to pay for the costs of administering and fully consummating the Plan and

\\cos:5:03-bk-01802    Doc 2594    Filed 07/09/04    Entered 07/09/04 17:27:15    Desc
Main Document      Page 57 of 61

closing the Chapter 11 Case. The Debtor believes that the Plan satisfies the financial feasibility requirement imposed by the Bankruptcy Code.

### E. Confirmation of the Plan

In the event the Bankruptcy Court determines that all of the requirements for the confirmation of the Plan are satisfied, the Bankruptcy Court will issue the Confirmation Order confirming the Plan pursuant to section 1129 of the Bankruptcy Code.

## XI. CERTAIN RISK FACTORS TO BE CONSIDERED

HOLDERS OF IMPAIRED CLAIMS AGAINST OR INTERESTS IN THE DEBTOR ARE ENCOURAGED TO READ AND CONSIDER CAREFULLY THE FACTORS SET FORTH BELOW, AS WELL AS THE OTHER INFORMATION SET FORTH IN THIS DISCLOSURE STATEMENT (AND THE DOCUMENTS DELIVERED TOGETHER HEREWITH AND/OR INCORPORATED BY REFERENCE), PRIOR TO VOTING TO ACCEPT OR REJECT THE PLAN. THOSE RISK FACTORS SHOULD NOT, HOWEVER, BE REGARDED AS CONSTITUTING THE ONLY RISKS INVOLVED IN CONNECTION WITH THE PLAN AND ITS IMPLEMENTATION.

### A. Parties-In-Interest May Object to the Debtor's Classification of Claims

Section 1122 of the Bankruptcy Code provides that a plan of reorganization may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class. The Debtor believes that the classification of claims and interests under the Plan complies with the requirements set forth in the Bankruptcy Code. However, the Debtor cannot give assurances that the Bankruptcy Court will reach the same conclusion.

### B. The Debtor's Ability to Consummate Is Subject to a Favorable Resolution of the Claims of the PBGC and the West Virginia Workers' Compensation Commission

1. The PBGC's Claim.

The PBGC has filed a Claim totaling $79 million asserting administrative priority under section 503 of the Bankruptcy Code and $825 under section 507(a)(1) of the Bankruptcy Code and unsecured priorities under sections 507(a)(3), (4) and (8) of the Bankruptcy Code for both statutory minimum contributions and unfunded benefit liabilities upon termination of the Pension Plan. Weirton disputes the amount and the priority status of the Claims asserted by the PBGC. Weirton and the PBGC are engaged in settlement discussions. Notwithstanding these discussions, distributions to creditors (both timing and amounts) could be adversely affected in the event Weirton and the PBGC are not able to amicably resolve issues relating to the Claims asserted by the PBGC.

### C. The Debtor May Not Be Able to Secure Confirmation of the Plan

The Debtor cannot assure you that the requisite acceptances to confirm the Plan will be received. Even if the requisite acceptances are received, the Debtor cannot assure you that the Bankruptcy Court will confirm the Plan. A non-accepting creditor or equity security holder of the Debtor might challenge the balloting procedures and results as not being in compliance with the Bankruptcy Code or Bankruptcy Rules. Even if the Bankruptcy Court determined that the Disclosure Statement and the balloting procedures and results were appropriate, the Bankruptcy Court could still decline to confirm the Plan if it found that any of the statutory requirements for confirmation had not been met. Section 1129 of the

Bankruptcy Code sets forth the requirements for confirmation and requires, among other things, a finding by the Bankruptcy Court that the confirmation of the Plan is not likely to be followed by a liquidation or a need for further financial reorganization and that the value of distributions to non-accepting holders of claims and interests within a particular class under the Plan will not be less than the value of distributions such holders would receive if the Debtor were liquidated under chapter 7 of the Bankruptcy Code. While the Debtor cannot give assurances that the Bankruptcy Court will conclude that these requirements have been met, the Debtor believes that the Plan will not be followed by a need for further financial reorganization and that non-accepting holders within each class under the Plan will receive distributions at least as great as would be received following a liquidation under chapter 7 of the Bankruptcy Code when taking into consideration all administrative claims and the costs and uncertainty associated with any such chapter 7 case.

The confirmation and consummation of the Plan are also subject to certain conditions. If the Plan is not confirmed, it is unclear whether a restructuring of the Debtor could be implemented and what distribution holders of Claims or Equity Interests ultimately would receive with respect to its Claims or Equity Interests. If an alternative reorganization could not be agreed to, it is possible that the Debtor would have to liquidate its assets, in which case it is likely that holders of Claims or Equity Interests would receive substantially less favorable treatment than they would receive under the Plan.

### D.     The Debtor May Object to the Amount or Classification of Your Claim

The Debtor reserves the right to object to the amount or classification of any claim or interest. The estimates set forth in this Disclosure Statement cannot be relied on by any creditor whose claim or interest is subject to an objection. Any such claim or interest holder may not receive its specified share of the estimated distributions described in this Disclosure Statement.

### E.     Insurance Claims

There is no guarantee that holders of Insurance Claims that are Allowed Claims will receive any payments on account of their Insurance Claims because such Claims may not be covered under the applicable Insurance Policies.

In addition, holders of Insurance Claims that are Allowed Claims, and that may otherwise be covered under the Insurance Policies, may not have access to or receive any proceeds under the Insurance Policies because the Insurers may deny coverage on otherwise valid claims. The Insurers have issued Insurance Policies to the Debtor that may provide coverage for Insurance Claims. The Insurers, however, may assert that the Plan may alter or violate the Insurers' rights under the Insurance Policies and applicable Law and may potentially seek to avoid any coverage otherwise available under the Insurance Policies. In particular, the Insurers may assert that the Plan violates the Insurers' rights to (i) control the defense, investigation, and settlement of Insurance Claims; (ii) require Weirton's compliance with the terms and conditions of the Insurance Policies; (iii) assert certain subrogation rights available to the Insurers under the Policies; and (iv) assert claims for setoff, contribution, and recoupment. The Insurers may also assert that the Plan seeks to provide certain injunctive relief that may alter Weirton's obligations under the Policies in such a way that would also void any available insurance coverage.

## XII.     WHERE YOU CAN OBTAIN MORE INFORMATION

Certain documents referred to in this Disclosure Statement have not been attached as exhibits because of the impracticability of furnishing copies thereof to all of the Debtor's creditors and equity security holders. Additional financial and other information about the Debtor can be found in Weirton's

\\Case 5:03-bk-01802    Doc 2594    Filed 07/09/04    Entered 07/09/04 17:27:15    Desc
Main Document      Page 59 of 61

Form 10-K for the fiscal years ended December 31, 2000, and 2001, its Forms 10-Q for the quarters ended March 31, 2002, June 30, 2002, and September 30, 2002, and its other filings from time to time with the SEC, each of which is incorporated in this Disclosure Statement by reference and is available at www.sec.gov or may also be obtained at prescribed rates by writing to the Public Reference Section of the SEC at Judiciary Plaza, 450 Fifth Street, N.W., Washington, D.C. 20549.

Pursuant to the requirements of the Office of the U.S. Trustee, the Debtor is required to and has filed monthly operating reports for the postpetition period with the Bankruptcy Court. These monthly operating reports may be obtained at prescribed per page copy rates by writing to the Clerk of the United States Bankruptcy Court for the Northern District of West Virginia, United States Federal Building & Courthouse, 12th and Chapline Streets, Wheeling, West Virginia, 26003, or on-line at the Bankruptcy Court's website: http://www.wvnb.uscourts.gov.

# XIII.   CONCLUSION AND RECOMMENDATION

The Debtor believes that confirmation and implementation of the Plan is preferable to any of the alternatives described above because it will provide the greatest recoveries to holders of Claims.  The Debtor urges holders of Claims entitled to vote on the Plan to vote to accept the Plan.

Dated:  July 9, 2004

WEIRTON STEEL CORPORATION,
a Delaware corporation


By:   _/s/ Robert C. Fletcher_____
Name:     Robert C. Fletcher
Title:       Authorized Agent


_/s/ Mark E. Freedlander_____
**MCGUIREWOODS LLP**
Robert G. Sable
Mark E. Freedlander
James H. Joseph
23rd Floor, Dominion Tower
625 Liberty Avenue
Pittsburgh, PA  15222
Telephone:  412.667.6000
Facsimile:  412.667.6050

-and-

**BAILEY, RILEY, BUCH & HARMAN, L.C.**
Arch W. Riley, Jr.
Riley Building
53 - 14th ST STE 900
Wheeling, WV  26003-0081
Telephone:  304.232.6675
Facsimile:  304.262.9897

Co-counsel to Weirton Steel Corporation